THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL MISZKIEWICZ, Defendant-Appellant.

First District (1st Division)   No. 1—89—0067

Opinion filed October 5, 1992.

412

J. Scott Arthur, of Olympia Fields, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Randall Roberts, and Stanislaus Gonsalves, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MANNING delivered the opinion of the court:

Defendant Daniel Miszkiewicz was charged in three indictments with delivery of less than 15 grams of cocaine on three separate occasions. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2).) The three indictments were consolidated for trial, although the record is silent upon whose motion they were consolidated. Following a bench trial, defendant was convicted on all three indictments and sentenced to six years in the Illinois Department of Corrections.

On appeal defendant argues that: (1) he was denied effective assistance of counsel; (2) he was deprived of a fair trial where the three offenses were joined for prosecution; and (3) the State did not disprove beyond a reasonable doubt that he was entrapped.

Prior to trial, the court admonished defendant that his attorney had pleaded guilty to charges which were generally referred to as "Greylord charges," and that he was scheduled to be sentenced in the future. Defendant was further advised that his attorney had testified in one trial and would possibly be testifying in others, and that the attorney had entered an agreement with the Attorney Registration and Disciplinary Commission (ARDC) to surrender his license. Defendant stated that he understood and was satisfied with the attorney's representation of him. Defendant also stated that "I haven't found him to be preoccupied with his problem. He has been putting forth a good effort for me."

The record reveals the following testimony was adduced at trial. Agent Lloyd, the State's principal witness, testified that on January 13, 1987, Anthony Shipanik (Shipanik or Tony) became a government informant. He signed written documents wherein he agreed to cooperate with the Metropolitan Enforcement Group (MEG) in their effort to prosecute drug dealers. Shipanik was assigned to work with Agent Lloyd.

Lloyd testified that Shipanik was given a written document which explained that he could never become involved in any activity that would constitute entrapment. Shipanik read this document in Lloyd's presence. At that time Lloyd also explained to Shipanik that he could not force anyone to sell drugs to them, nor could he convince anyone

to enter the narcotic business in order to introduce that person to Lloyd. Lloyd testified further that Shipanik verbally indicated that he understood the rules and signed the document.

Between January 15 and April 1, 1987, Shipanik provided Lloyd with defendant's name as a drug dealer. Lloyd contacted the Orland Park police department and was advised by Detective Muller that he had uncorroborated information that defendant dealt cocaine in the southwest suburbs.

On April 1, 1987, Shipanik arranged a meeting between Lloyd and defendant. Lloyd instructed Shipanik to have defendant bring two grams of cocaine to the meeting. Lloyd and Shipanik drove in an undercover vehicle to a Burger King restaurant where Lloyd was introduced to defendant. The three left the restaurant and entered Lloyd's car in the parking lot where defendant produced a small clear plastic bag containing white powder. Lloyd testified that defendant told him the cocaine was of "very high quality" and that no dilutants had been added. Lloyd gave defendant $180 and asked him what his usual prices were for cocaine. Defendant then gave Lloyd prices for an eighth, quarter, and half ounce and an ounce of cocaine. Lloyd testified that he then asked defendant how he could contact him in the future for additional purchases. Defendant advised Lloyd to call Shipanik and that Shipanik would contact him.

On April 9, 1987, Shipanik gave defendant Lloyd's telephone number and suggested that he contact Lloyd. Defendant called Lloyd and asked whether he wanted to purchase more cocaine. Lloyd testified that defendant told him the price was $275 for an eighth of an ounce and arranged for the two to meet at the same Burger King restaurant where the first contact took place. Lloyd drove the undercover vehicle to the restaurant, arrived about 8:30 p.m. and waited inside for about 20 minutes, at which time defendant arrived. Lloyd and defendant walked back to Lloyd's car, where the money and cocaine were exchanged. Lloyd testified that he again asked defendant how he could contact him in the future to make more purchases, but defendant refused to give Lloyd his telephone number. Lloyd stated that defendant told him that he would call on a weekly basis between 6:30 and 8:30 p.m. to take Lloyd's cocaine order. Lloyd then gave defendant his undercover telephone number.

Defendant called Lloyd on April 13, 1987, and Lloyd told him that he wanted to purchase another "eight ball." Defendant suggested that they meet at a Venture store in Orland Park. After defendant arrived at the store, he called Lloyd, stated the price was $275 and told him to drive to the store where they would make the exchange. Lloyd

met defendant, who was accompanied by a female, at the entrance to the store. They entered Lloyd's vehicle and defendant instructed Lloyd to drive out of the parking lot. Lloyd testified that defendant told his female companion to "give Joe the stuff," and she handed Lloyd a clear bag containing a white powder. Lloyd then gave defendant $275 and asked him the price for various quantities of cocaine. Defendant quoted a price of $500 for a quarter of an ounce and $1,650 to $1,750 for an ounce. Lloyd told defendant he would be interested in purchasing additional quantities in the future, gave defendant his telephone-pager number and told him to call that following week.

On May 11, 1987, defendant called Lloyd and asked whether he wanted to purchase an ounce of cocaine, and Lloyd stated "yes." Defendant told Lloyd that the price would be $2,000, but Lloyd was dissatisfied with the price and asked defendant to lower the cost. Lloyd testified that defendant said he would check with his drug connection and would contact him at a later time.

Defendant called Lloyd on May 15, 1987, with a lower price of $1,900 and made arrangements to again meet at the Venture store parking lot. Lloyd contacted his surveillance personnel to discuss the anticipated delivery. Lloyd drove his undercover vehicle to the store's entrance and defendant exited the store, walked to Lloyd's car and entered. Defendant directed Lloyd to drive westbound through the parking lot to defendant's car. Lloyd and defendant exited Lloyd's car and entered defendant's car. Defendant then drove out of the lot and returned about two minutes later. At that point, he handed Lloyd a clear plastic bag containing white powder and told Lloyd that the cocaine had not been "stepped on" and that the cost was $1,900. Lloyd gave defendant the money and told him that he wanted to purchase three to four ounces of cocaine every week. After defendant placed the money in his pocket, Lloyd gave a prearranged arrest signal. Once the vehicle stopped, the surveillance team converged on defendant's car and arrested him. Defendant's car was searched and a clear plastic bag containing white powder was recovered. The contents of both bags were tested and the field test was positive for the presumptive presence of cocaine.

The parties stipulated that if Deborah Jurisic, Karl Larsen and Aurelin Lynn Rizzo, chemists employed by the Maywood Forensic Sciences Laboratory and the Illinois State Police Crime Lab, were to testify their testimony would establish that on April 13 and 14, 1987, and June 15, 1987, they received packets of white powder from Agent Lloyd seized from defendant, and after analyzing the white powder,

determined that the powder was cocaine. It was further stipulated that the weight of the four bags of cocaine was 37.3 grams.

Defendant testified that he was employed and had matriculated at DeVry Institute, from which he had received a diploma as a certified electronic technician and an associate of applied science degree. He testified that he had never been arrested or convicted of any criminal offense other than traffic. He explained that he first met Anthony Shipanik (Tony) when he sought a job at Crown Buick while he was also attending school. Tony was a manager at Crown Buick and was responsible for defendant being hired. After leaving Crown Buick to accept his present position with Pitney Bowes, he did not see or hear from Tony until one day he returned to Crown Buick, where he had purchased a 1986 Buick, to obtain an extended warranty on his car. After conversing with Tony about the extended warranty, Tony asked defendant if he could ask defendant a personal question to which defendant responded yes. It was then that Tony approached him about securing some cocaine. Defendant asked Tony if he used cocaine and Tony responded that the cocaine was for a friend named "Joe." Defendant initially refused to get involved in such an activity. However, Tony inundated defendant with telephone calls imploring him to just do this one favor. At one point Tony even threatened to divulge some information to the owner of the Buick dealership regarding some extra equipment which had been given to defendant when he purchased his car. Tony backed down on the threat and suggested that he was only kidding. After being bombarded with numerous telephone calls from Tony, defendant finally agreed to find a source. He remembered that his landlord's brother was a drug dealer, and he looked up his telephone number, called him and conversed with him. Later Tony called defendant and defendant told Tony that he had found a source and sought to give the name and telephone number of the source to Tony. Tony rejected having the information given to him, explaining that the dealer would not sell to him. He told defendant that he needed defendant to make the purchase and deliver it to him. Defendant reluctantly agreed to this arrangement.

While he had been told that the drugs were for a friend of Tony's, he considered this to be a personal favor for Tony, and he was visibly upset when Tony showed up for the delivery accompanied by the friend, "Joe." After the delivery, he complained to Tony about bringing the friend to the meeting place. Two days later Tony called him and advised him that "Joe" wanted to do more business with him. At first, defendant balked and said there would be no more business. Tony persuaded him that one more delivery would make them "even."

He once again reluctantly agreed to it. Tony did not show up for the second delivery. "Joe" was there and that is with whom defendant transacted the delivery. He received the money and he then gave "Joe" the drugs. He testified that he was very nervous and denied engaging in any conversation.

He testified that thereafter Tony continuously called him exhorting him to continue dealing with "Joe." Initially he said no. He complained to Tony that he had been spending his own money to purchase the drugs. Tony suggested to him that the dealer could "front" for him. Tony explained that meant the dealer would give him the drugs and collect from him after he had collected from the purchaser. Defendant called the dealer and the dealer agreed to "front," but the first time, he sent a female friend with defendant in order to insure collection of his money. Defendant described the last two sales and he denied that he ever gave Agent Lloyd (Joe) various prices for various quantities of cocaine. He also denied that he described the drugs, *i.e.*, pure rock without dilutents, stepped on, of very high quality, etc. He likewise denied that he told "Joe" that he would call him on a weekly basis between 6:30 and 8:30 p.m. to take his cocaine order. He denied that he promised "Joe" that if he became a regular customer he would see that the prices were lowered or that "if you have a head cold the stuff will do you right and clear it up right away." Defendant testified that all of the sales, including the last two sales, were set up through Tony. Tony persuaded him that they had the perfect buyer, that defendant had the perfect supplier and they were the perfect team who could get rich together. Defendant's testimony regarding the last sale of one ounce of cocaine to Agent Lloyd for $1,900 was substantially similar to what Agent Lloyd had testified except for the conversation, which defendant denied had occurred. Finally, he testified that upon being placed under arrest, Agent Lloyd offered to see that he received lenient treatment if he would assist MEG in obtaining the arrest and conviction of three individuals for delivery of one or more ounces of cocaine. He told Agent Lloyd that he knew only one such person, his supplier, and he offered to give his name to Agent Lloyd, which he did.

Defendant first argues that he was denied the effective assistance of counsel. This contention is predicated on three bases, *i.e.* (1) conflict of interest, (2) *per se* ineffectiveness, and (3) deficient representation resulting in actual prejudice. Specifically, he maintains that a special relationship existed between Cary Polikoff, his attorney, and Anthony Shipanik, the informant, who referred him to attorney Polikoff, and hence, his right to conflict-free counsel was violated. Addi-

tionally, he contends that because defense counsel had been convicted in "Operation Greylord," was awaiting sentencing, was a witness for the prosecution in pending "Greylord" cases contemporaneously while defendant's trial was ongoing, and the revocation of his license to practice law was imminent, counsel's representation of him was *per se* ineffective. Finally, he argues that Polikoff's representation of him was fraught with mistakes and omissions and was so deficient that it resulted in actual prejudice to the defense of his case.

We initially address defendant's concerns regarding the alleged conflict of interest. Defendant retained Cary Polikoff to defend him based, according to him, on a referral by the informant, Anthony Shipanik. On appeal defendant contends that Shipanik and Polikoff were friends.

The sixth amendment guarantees to a criminal defendant the right to the effective assistance of counsel as a fundamental right. (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708.) "The right to effective assistance of counsel under the sixth amendment entitles a criminal defendant to the undivided loyalty of counsel, free from conflicting interests or inconsistent obligations." *People v. Thomas* (1989), 131 Ill. 2d 104, 111, 545 N.E.2d 654, citing *People v. Flores* (1989), 128 Ill. 2d 66, 83, 538 N.E.2d 481.

A *per se* conflict occurs when the tie between defense counsel to a person or entity—either counsel's client, employer, or his own previous commitment—might subliminally affect counsel's performance in ways difficult to detect and demonstrate. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 15, 525 N.E.2d 301; *People v. Thomas* (1989), 131 Ill. 2d 104, 111, 545 N.E.2d 654.) However, defendant's contention of a special relationship in the instant case between Polikoff and Shipanik is pure conjecture since no evidence was ever presented that supported such a claim. At most, defendant presented evidence that Shipanik knew Polikoff sufficiently to recommend him to defendant. The record does not, however, bear out defendant's conclusory speculation that Polikoff and Shipanik were "friends."

■ Other than defendant's unsubstantiated claim that Polikoff and Shipanik were "friends," nothing in the record supports defendant's contention regarding this alleged division of loyalty. Defendant, in his appellate brief, on one hand promises to supplement the record with an affidavit setting forth in detail the factual circumstances of this relationship, and on the other hand concedes in his brief "it is unknown from this record whether Polikoff actually had this type of relationship with Shipanik." We fail to find nor have we been referred to any portion of the record which contains such an affidavit. It is the

appellant's responsibility to provide an adequate record on appeal. In the absence of a complete record, the court is compelled to assume that the missing evidence supports the court's or jury's decision. (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 459 N.E.2d 958; *Dell'Armi Builders, Inc. v. Johnston* (1988), 172 Ill. App. 3d 144, 149, 526 N.E.2d 409, 412.) The court of review is not obligated to search the record to find a basis for reversal, and unless reference is made to those portions of the record supporting reversal, the argument will not be considered. (*Webb v. Angell* (1987), 155 Ill. App. 3d 848, 854, 508 N.E.2d 508.) Accordingly, we decline to consider this aspect of defendant's argument relating to an alleged conflict of interest.

■ Defendant next maintains that a *per se* conflict exists also because of Mr. Polikoff's trouble with the law and his pending charges before the ARDC. We find this assertion to be without merit. Our supreme court has recently declined to create a *per se* conflict of interest rule in situations involving attorneys representing criminal defendants while disciplinary action by the ARDC is pending. *People v. Szabo* (1991), 144 Ill. 2d 525, 582 N.E.2d 173.

In *Szabo*, the defendant was convicted in a bench trial of multiple criminal offenses, including murder, for which the death penalty was imposed. After the judgment was affirmed on direct appeal, defendant alleged in a *pro se* post-conviction petition, in part, that his counsel was prevented from rendering effective assistance of counsel due to pending disciplinary charges before the ARDC. Szabo, as does defendant Miszkiewicz in the case at bar, relied primarily on *People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136, wherein the supreme court ordered a new trial for defendant Williams when, after initially affirming defendant's conviction and sentence, and while a petition for rehearing was pending, the court was made aware that during the pendency of the trial, the defense attorney had pending charges before the ARDC. In *Williams*, a complex, multiple-defendant, death penalty case in which two juries were impaneled simultaneously and defense counsel represented three of the four defendants before the simultaneously impaneled juries, the supreme court ordered a new trial for defendant Williams. The supreme court in *Szabo* distinguishes the factual variances between the two cases and points out the uniqueness of the *Williams* case, which it found not to be duplicated in *Szabo*. Similarly, we find the factual matrix in the instant case to be unlike the facts in *Williams* and, hence, hold that *Williams* is inapposite.

Additionally, in considering a claim of *per se* conflict, the issue of waiver is pertinent. The right to conflict-free counsel may be waived.

(*People v. Olinger* (1986), 112 Ill. 2d 324, 339, 493 N.E.2d 579, citing *Holloway v. Arkansas* (1978), 435 U.S. 475, 483 n.5, 55 L. Ed. 2d 426, 433 n.5, 98 S. Ct. 1173, 1178 n.5; *People v. Kester* (1977), 66 Ill. 2d 162, 166, 361 N.E.2d 569.) However, a waiver must be knowing. (*Kester*, 66 Ill. 2d at 168.) In the case at bar, the trial court meticulously admonished defendant of Mr. Polikoff's troubles, both with the law and with the ARDC. Specifically, he was told that his attorney was testifying in trials against other lawyers as well as judges, that his lawyer had pleaded guilty to "Greylord" charges, that his lawyer was scheduled to be sentenced in the near future and that his lawyer had agreed to surrender his law license. The record further reveals the defendant to be a literate individual who had matriculated at DeVry Institute and had received an associate degree. (See *People v. Olinger* (1986), 112 Ill. 2d 324, 339, 493 N.E.2d 579; *People v. Washington* (1984), 101 Ill. 2d 104, 114, 461 N.E.2d 393.) He responded to the court's admonition by stating that he understood, was satisfied with the attorney's representation, had found the attorney not to be preoccupied with his problems and found him to be "putting forth a good effort for me."

Assuming *arguendo* there is a *per se* conflict in this case, we find there has been a knowing waiver thereof by the defendant, after a full and complete admonition by the court of any potential conflict. *Kester*, 66 Ill. 2d 162, 361 N.E.2d 569.

Defendant also suggests that Mr. Polikoff was in a race with the clock to conclude this trial very expeditiously and that such an objective was likewise a competing interest which constituted a *per se* conflict. He points to two alleged mistakes as evidence that Mr. Polikoff "hurried" the trial to his detriment in order to conclude it prior to being disbarred. The two alleged mistakes were (1) failure to take some remedial action after becoming aware of a statement defendant made to Agent Lloyd and (2) failure to object to joinder of the three indictments being consolidated for trial. We have combed the record, and after doing so, we reject defendant's argument. We shall address the statement and the joinder later. While set forth in the record are references to time constraints faced by the attorney within which to complete the case, it does not appear that such constraints impacted on the time and effort expended by Mr. Polikoff on defendant's behalf. Mr. Polikoff was available each time the court was able to accommodate the continuing trial of this case, and the ARDC even extended the time before revoking counsel's license to allow the case to be concluded. Clearly, counsel had one foot in the prison door and wanted to expedite the completion of all his personal matters before

the door was completely shut. However, we find nothing in this record that reflects that the case was hurried to completion to defendant's detriment. Moreover, defendant acknowledged the "good effort" being put forth by defense counsel and stated that he was satisfied with his representation and "had not found him to be preoccupied with his problems."

Defendant's final contention regarding ineffective assistance of counsel is that Mr. Polikoff committed numerous errors at trial.

In sum, defendant sets forth eight instances of alleged substandard performance by Mr. Polikoff, *i.e.* (1) introduction of a fourth uncharged delivery of cocaine at trial without objection; (2) failure to object to the joinder of three unrelated indictments; (3) failure to object to the amendment of an indictment changing the date of occurrence after trial had commenced; (4) failure to move for a directed finding at the close of the State's case in chief; (5) inability to lay the proper foundation to introduce character evidence; (6) failure to locate witnesses and failure to comply with discovery by notifying the State of witnesses' names; (7) elicitation from a witness on cross-examination damaging hearsay evidence; and (8) failure to object to the admission of a statement allegedly made by defendant which was disclosed for the first time during trial and failure to take other action such as requesting a continuance or moving to bar its admission for failure to comply with discovery.

Having determined that defendant has failed to show that *per se* ineffectiveness or conflict of interest occurred, we must now look beyond the mere happenstance of counsel's difficulties with the law and ARDC, and decide whether Mr. Polikoff's performance was deficient and as a result whether defendant was prejudiced thereby.

The established test used to determine the deprivation of effective assistance of counsel is set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. In *Strickland*, the Supreme Court stated that in analyzing a claim of ineffective assistance of counsel, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, a presumption that a defendant has to overcome. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) In order for a defendant to succeed on an ineffective assistance of counsel claim, he must show that counsel's performance was so deficient that it fell below an objective standard of reasonableness and the performance prejudiced the defense of the case. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

In analyzing a case under the two-prong *Strickland* standard, it is not uncommon to first determine if the errors complained of resulted in prejudice to defendant which could have conceivably affected the outcome of the case. Our supreme court has adopted this practice in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. Accordingly, we examine each of defendant's contentions to determine if defendant was prejudiced thereby.

With respect to counsel's failure to object to the introduction of the fourth uncharged delivery and to the joinder of the three unrelated indictments, we view this as trial strategy. This becomes obvious upon perusal of counsel's closing argument to the court where he stated, in pertinent part:

"What about the fact that there was more than one offense committed. Illinois courts have held that this may be used by the trier of fact as evidence of predisposition, that it can take into account that more than one offense was held. It has never stated, however, that this is outcome determinative. It has not issued a litmus test stating that a person can avail himself of an entrapment offense [*sic*] if he commits only one offense but he can't if he does it for four offenses or three offenses, or if such were the case then clearly the blueprint would be open to law enforcement people and they would know exactly how many offenses to get in order for them to avoid the defendant interposing a defense of entrapment.

One court put it this way, that the fact that a defendant committed a second offense or a subsequent offense close in proximity to the first offense manifested a desire to become involved in the trade and a deliberate intent to do something and it stated that the jury was not wrong in finding that the defendant was predisposed to committing the crime. I would submit that the facts of that case are distinguishable from this case in many, many respects.

I would ask the court to consider whether in reality this is a case of multiple offenses. I think it is not. These three charges and the fourth one for which he is not charged constitutes [*sic*] one continuing course of conduct and should be judged by this court as such. I was very gratified when the State agreed to let all three of these charges be tried as a single—in a single trial because it certainly lessened the complications of having to bring out all his what would be extraneous if those cases were tried piecemeal.

> I think the evidence is clear and is unrefutable that it was the intention of Officer Lloyd to commit as many—to have the defendant commit as many drug offenses as possible until he reached the point where and in the one instance he could charge him with a Class X felony and in the second instance that he could undermine any possible entrapment defense. I think his own testimony bears that out.
>
> And I would call the court's attention to a statement he made in cross-examination in response to the question why didn't you arrest the defendant at that time. And his answer was, and I quote, 'It was part of our investigative technique to conduct an investigation on a person such that the person must be proven in court to show a predisposition to deal the drugs and the way we do that is to show that the person is predisposed to deal the drugs over a period of time rather than just one short occasion.'
>
> It's quite clear that Investigator Lloyd was cognizant of the offense of entrapment and of course it's reasonable that he should be because he's working in an agency which is specially designed for covert operations where these police officers were undercover and it necessitates their use of informants. And they become educated over a period of time to know that when using informants there is a danger of entrapment."

From the foregoing closing argument, defense counsel's strategic intent is clear. Even if it was unsound strategy, it does not detract from the fact that it was strategy.

Moreover, the record fails to reveal the circumstances of the joinder or who initiated it. As pointed out earlier, it is the responsibility of the appellant to provide a complete record, and in the absence of a complete record, it is presumed that the trial court acted properly. Furthermore, defendant fails to show how he was prejudiced. Even if the charges had not been joined in one prosecution, they could have been received as other crimes evidence to show *modus operandi*, or a motive, or a plan or scheme of conduct. (*People v. Lehman* (1955), 5 Ill. 2d 337, 343, 125 N.E.2d 506 (subsequent act admissible to show plan); *People v. Allen* (1971), 1 Ill. App. 3d 197, 200, 272 N.E.2d 296 (subsequent act admissible to refute argument that the defendant lacked intent); *People v. Knox* (1967), 90 Ill. App. 2d 149, 160, 234 N.E.2d 1281 (subsequent act admissible to show plan, or to show criminal intent).) The testimony of Agent Lloyd led to the inescapable conclusion that a plan existed to furnish a continuing supply of cocaine to "Joe." (*People v. Wells* (1989), 184 Ill. App. 3d 925, 931, 540

N.E.2d 1020.) Here we have a case where the defendant raises an entrapment defense. The United States Supreme Court in *Sorrells v. United States* (1932), 287 U.S. 435, 451-52, 77 L. Ed. 413, 422, 53 S. Ct. 210, 216, held that "if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense." We glean from the above-cited principle that both prior conduct and subsequent conduct are admissible if relevant to the issue of predisposition of the defendant to commit the crime charged. The door opens for the admission of evidence which might otherwise be inadmissible when one pleads the defense of entrapment. (*People v. Tipton* (1980), 78 Ill. 2d 477, 486, 401 N.E.2d 528.) We reject defendant's contention that joinder and the admission of the fourth uncharged delivery constituted reversible error and that counsel's ineffectiveness resulted in such error under the factual matrix here presented.

Defendant urges this court to find ineffective assistance of counsel by virtue of defense counsel's failure to object to the court's allowance of the State's motion to amend two of defendant's indictments changing the dates of the occurrences after trial had commenced. We note that appellate counsel concedes in his brief that such an amendment may have been legally permissible and points to no detriment suffered by defendant as a result of the amendments.

Section 111—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 111—5) provides that an indictment "may be amended on motion by the State's Attorney or defendant at any time because of formal defects." This very issue arose in the case of *People v. Barlow* (1989), 188 Ill. App. 3d 393, 402, 544 N.E.2d 947. In that case, the indictment alleged that the offense had occurred "on or about March 2, 1986, and continuing on through March 3, 1986." The State's bill of particulars revealed that the incident had occurred on or about March 1 through 3, 1986. Several months later the State filed an amended bill of particulars indicating the date of the offense as "on or about March 1st through the 5th, 1986." The indictment was later amended to reflect the new dates set forth in the amended bill of particulars. The *Barlow* court held that in the absence of a statute of limitations issue, and in light of the fact that the amended dates preceded the return of the indictment, the incorrect dates on the original indictment constituted a formal defect which, pursuant to section 111—5 of the Code, could be cured by amendment. The court further pointed out that it found no deprivation of due process where

"the charge was stated as definitely as possible, the date alleged in the indictment was not a material element of the offense, the date was sufficient to show that the offense charged was committed within the statute of limitations period and the date preceded the return of the indictment." *Barlow*, 188 Ill. App. 3d at 402.

■ The case at bar is very similar to *Barlow*. While the original indictment alleged May 12, the bill of particulars filed by the State reflected May 15. As in *Barlow*, the date in this case is not an element of the offense, there is nothing to suggest a statute of limitations issue and the offenses occurred in 1986 and the indictments were returned in 1987. Hence, the date preceded the return of the indictment. Additionally, based upon the defense presented, there was no contest that the occurrences took place, only that there was an entrapment.

Accordingly, because the amended dates did nothing to modify the substance of the offenses charged and the dates comported to statutory requirements, we hold that the amendments were properly allowed by the court and any objections thereto would have been without merit.

■ Defendant further complains of Mr. Polikoff's inability to lay a proper foundation for the introduction of character evidence, but once again concedes that the outcome would not have changed; hence, no prejudice obtained. Moreover, there is no showing of prejudice to defendant by Mr. Polikoff's failure to locate witnesses or comply with discovery by notifying the State of witnesses' names. The record does not reflect who the witnesses were, what they would have testified to, or that any witnesses ultimately presented were barred from testifying for failure to notify the State of their existence.

Defendant asserts that Mr. Polikoff's failure to move for a directed finding constituted ineffective assistance of counsel. We disagree. We are unable to determine how the outcome would have differed. There was no argument then or now that the State's evidence was legally insufficient at that stage of the proceedings. See *People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089.

The next contention relates to defense counsel's cross-examination of Agent Lloyd during which he elicited from Lloyd a conversation the agent allegedly had with Detective Muller of Orland Park about defendant's reputation as a southwest suburban drug dealer. He contends on appeal that defense counsel rendered ineffective assistance of counsel when he elicited hearsay evidence which severely damaged his defense. The purported hearsay evidence which he complains of was a statement by Agent Lloyd that he had inquired of Detective

Muller about what Muller knew of defendant's activities and the detective told him that he had uncorroborated information that defendant dealt a substantial amount of cocaine in the southwest suburbs.

While in a nonjury case there exists a rebuttable presumption that the judge "sifted the wheat from the shaft" and considered only that evidence which was properly admitted (*People v. Christiansen* (1987), 116 Ill. 2d 96, 586 N.E.2d 1253), hearsay evidence which is admitted without objection is to be considered and given its natural probative effect. (*Jackson v. Board of Review of the Department of Labor* (1985), 105 Ill. 2d 501, 508, 475 N.E.2d 879; see also *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) In the case at bar, defense counsel's actions were clearly strategic. In his vigorous cross-examination of Lloyd, Polikoff sought to impeach Lloyd. Lloyd had testified to the steps he took in trying to ascertain the reliability of his source of information (SOI). To that end he testified that he often called local police departments to obtain information about the criminal background of persons whose names were given to him as being involved in drug-dealing activities. He stated that he had called Detective Muller to find out about the defendant and Detective Muller told him that he had uncorroborated information that defendant was involved heavily in drug dealing in the southwest suburbs. In eliciting from Lloyd this alleged conversation with Muller, Polikoff was laying a foundation to later impeach Lloyd with testimony of Muller that no such conversation ever took place. He also was attempting to show the improbability of Lloyd having contacted Detective Muller on the same day as the first buy occurred, April 1, 1987.

Subsequently, during the defense's case in chief, Polikoff called Detective Muller as a witness for the defense and elicited from him testimony that contradicted Lloyd's earlier testimony. Detective Muller testified that he had no knowledge of any drug dealing by defendant and had not received an inquiry about defendant's drug dealing activities from Agent Lloyd.

■ In light of the purpose for which this testimony was elicited, we fail to find counsel's performance substandard. He succeeded in impeaching the testimony of the State's star witness, and the testimony was obviously offered for the sole purpose of impeachment of Agent Lloyd. While this testimony was elicited by defense counsel, it is presumed that the trial judge considered it for the purpose for which it was offered. (See *People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849.) While such a presumption may be rebutted, there must be an affirmative showing in the record of such rebuttal. (*People v.*

*Gilbert,* 68 Ill. 2d at 258-59, citing *People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143; *People v. Grodkiewicz* (1959), 16 Ill. 2d 192, 157 N.E.2d 143.) The record in the instant case is totally devoid of any such rebuttal. Nowhere in the record is there an indication that the court considered the testimony of Agent Lloyd regarding his conversation with Detective Muller as substantive evidence.

The State cites, in support of its position that defense counsel vigorously defended Daniel Miszkiewicz, *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. In that case the supreme court held that a reviewing court need not determine whether counsel's performance was deficient before examining the prejudice suffered by defendant as a result of the alleged deficiencies. (*Albanese,* 104 Ill. 2d at 527.) Albanese, similar to Miszkiewicz in the instant case, set forth numerous instances of alleged mistakes and omissions by defense counsel. He alleged that counsel erred by (1) eliciting, acquiescing in and stipulating to evidence that tended to indicate arsenic-poisoning deaths are more often the result of homicide than of any other cause; (2) failing to object to evidence of defendant's finances and to references to other crimes in the confession and suicide notes; (3) failing to object to a statement in closing argument that defendant had been jailed for failure to pay child support; and (4) failing to examine the People's financial exhibits in sufficient detail to expose alleged flaws in testimony from the People's financial expert. It was Albanese's contention that, but for the errors committed by his counsel at trial, he would not have been convicted. The *Albanese* court disagreed, finding that, even assuming *arguendo* that all of the alleged errors constituted substandard representation, the outcome of the case would not have been different. *Albanese,* 104 Ill. 2d at 527.

We, likewise, in the case at bar reject defendant Miszkiewicz's contention that, but for the alleged errors committed by defense counsel at trial, the outcome would have been different. As in *Albanese,* defendant cannot show prejudice arising from the alleged errors. Defense counsel vigorously and forcefully cross-examined Agent Lloyd in all aspects of his testimony. He presented a strong entrapment defense, but lost because the trier of fact decided the credibility issue for the State. There was overwhelming evidence of defendant's predisposition to engage in drug-dealing activities, and the court simply found the police officer to be a more credible witness, taking into account all of the circumstances presented.

The last contention regarding the issue of ineffective assistance of counsel relates to the defendant's statement allegedly made to Agent Lloyd which admittedly was damaging to defendant's case. After trial

had commenced, a statement attributable to the defendant was produced. Mr. Polikoff was unaware of its existence. He reviewed it for five minutes and proceeded to allow the prosecution to present it without objection. The contents included an acknowledgment that defendant used drugs and had a supplier. The statement may have been detrimental to the defense of entrapment which defendant was asserting. However, most evidence against a criminal defendant is detrimental. We also note that defendant himself testified to the fact that he had a supplier in the context of his discussion with Lloyd about possibly becoming an SOI. The question is whether counsel rendered ineffective assistance by failing to take some affirmative action upon learning of the existence of a statement. He could have sought to bar its admission by either a motion to suppress or a motion *in limine*. However, there must be a legal basis to support such motions. Defense counsel is not required to file frivolous motions which have no legal basis.

We note that the defendant, prior to trial, filed an affidavit in support of a discovery motion wherein he acknowledged that he had a supplier. This acknowledgment suggested that the supplier was sought out after he was approached by Tony Shipanik. Defendant also testified at trial to his many contacts with his supplier in connection with the transactions which constitute the basis for those indictments.

■ The record, as well as the appellate brief, gives this court an insufficient basis upon which to conclude that the statement was erroneously admitted. There is no allegation that the defendant was not given his *Miranda* rights. Likewise, nothing in the record suggests that the statement was involuntarily made. Defendant in his brief acknowledges that it is not clear if there was a discovery violation. Assuming *arguendo* that such a violation did occur, defendant has waived any defects in the State's response to a discovery motion by making a clear and unequivocal judicial admission of guilt in his attempt to raise an entrapment defense. (See *People v. Coslet* (1977), 67 Ill. 2d 127, 131, 364 N.E.2d 67, citing *People v. Green* (1959), 17 Ill. 2d 35, 42, 160 N.E.2d 814, *cert. denied* (1960), 361 U.S. 972, 4 L. Ed. 2d 551, 80 S. Ct. 605.) Taking into consideration the deficiencies noted in the record and the appellate brief, this court can only conclude the statement was properly admitted in the absence of that evidence to the contrary. *Foutch*, 99 Ill. 2d 389, 459 N.E.2d 958; *Dell'Armi Builders, Inc.*, 172 Ill. App. 3d 144, 526 N.E.2d 409.

While taking no action regarding the statement may have been an error in judgment, such errors do not establish incompetency of counsel. *People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136, citing

*People v. Washington* (1968), 41 Ill. 2d 16, 21, 241 N.E.2d 425; *People v. Green* (1967), 36 Ill. 2d 349, 223 N.E.2d 101.

Defendant's final contention on appeal is that the State has failed to disprove beyond a reasonable doubt that he was entrapped in light of his uncontradicted testimony that Anthony Shipanik asked, begged, cajoled and threatened him into making the deliveries of cocaine. Defendant takes the position that the only evidence which could properly rebut his testimony would be from the mouth of Anthony Shipanik only. He asserts that the trial court erred by its finding that defendant was predisposed to commit these offenses in light of his alleged familiarity with drug terminology and telephone calls initiated by him to Agent Lloyd. He argues that these allegations were all uncorroborated testimony of Agent Lloyd as contrasted to his own corroborated testimony.

The State does have the burden to prove beyond a reasonable doubt that entrapment did not occur once defendant raises it as a defense. (*People v. Dollen* (1972), 53 Ill. 2d 280, 284, 290 N.E.2d 879.) The issue is a factual determination unless the court can find as a matter of law that entrapment took place. As Justice Clark stated in his dissenting opinion in *People v. Tipton* (1980), 78 Ill. 2d 477, 489, 401 N.E.2d 528, "[t]he crucial inquiry in disproving entrapment is whether the defendant was predisposed to commit the offense." The facts in *Tipton*, in a general sense, are remarkably similar to the facts in the instant case. Defendant Tipton's help was solicited by a former girlfriend (who, unbeknown to Tipton, had become a paid informer) to secure some cocaine for her and her "boyfriend" (the undercover agent). In an effort to do her a favor, according to his testimony, he found a source and took her and the agent to meet the source where the transaction took place. In that case, however, Tipton never handled the drugs. While the record revealed the lack of any prior history of drug abuse, he did take another individual to this same source at a subsequent date for the purpose of securing cocaine. In upholding Tipton's conviction and rejecting his defense of entrapment, the supreme court stated that because the evidence indicated to the fact finders defendant's familiarity with drugs, his knowledge of a supplier, and his willingness to accommodate those seeking drugs, that evidence was adequate to sustain a verdict of guilty. (*Tipton*, 78 Ill. 2d at 488.) In *Tipton*, as in this case, defendant points out that the State failed to call the informer as a trial witness. Consequently, defendant Tipton argued, as does defendant Miszkiewicz, that his testimony of inducement by the informer was uncontradicted, and hence, his defense of entrapment must be accepted. The supreme court rejected that argu-

ment, pointing out that such an argument overlooks a consideration of predisposition which is a factor to be considered when the defense of entrapment is raised. (*Tipton*, 78 Ill. 2d at 488, citing *People v. Cross* (1979), 77 Ill. 2d 396, 406-07, 396 N.E.2d 812.) The court further held that any inference arising against the State because of its unexplained failure to call the informer would be negligible in light of the evidence of predisposition. *Tipton*, 78 Ill. 2d at 489, citing *People v. Cross* (1979), 77 Ill. 2d 396, 406-07, 396 N.E.2d 812.

■ In the case at bar, defendant Miszkiewicz was solicited by a former co-worker, Anthony Shipanik (Tony) (who, unbeknown to defendant, had become an informer for the Metropolitan Enforcement Group (MEG)) to secure cocaine for a friend named "Joe." After being convinced that it would be a great favor to Tony, defendant agreed to obtain the drugs. While Miszkiewicz did not realize that Shipanik would be accompanied by "Joe" when he delivered the drugs to Shipanik the first time, he nevertheless continued to engage in transactions with "Joe" in Shipanik's absence. According to defendant's testimony, he located a source and purchased the drugs with his own money. Unlike the defendant in *Tipton*, however, defendant Miszkiewicz actually handled the drugs and the money. Like the defendant in *Tipton*, defendant Miszkiewicz had no prior record of drug dealing, and he performed subsequent acts after the initial delivery relating to drug dealing. Miskiewicz contends that because the State failed without explanation to call Anthony Shipanik as a witness at the trial, his uncontradicted testimony of Tony's inducement of him is sufficient to uphold his defense of entrapment. We reject that contention. As the supreme court held in *Tipton*, defendant's argument overlooks the overwhelming evidence of predisposition. In every one of the drug transactions, only defendant Miszkiewicz possessed the cocaine and collected the money. He was thoroughly familiar with the terminology of the drug culture. He assured Agent Lloyd of the high quality of the drug, he assured him that it had not been "stepped on," he was able to quote prices for various quantities which confirms defendant's access to a source and supply of drugs, and he offered to henceforth deliver pure rock cocaine uncut with dilutants for any future transactions between them. See *People v. Darnell* (1990), 214 Ill. App. 3d 345, 573 N.E.2d 1252.

After the initial introduction to Lloyd by Tony, all subsequent transactions were conducted out of the presence of Tony. Defendant performed as a salesman. He provided Lloyd with a laundry list of amounts of cocaine available to him and promised to seek lower prices from his supplier. All of these actions were indicative of defendant

Miszkiewicz's predisposition to traffic in drugs. The court's finding of guilty of defendant on all indictments was based on credibility of the witnesses.

We fail to find an abuse of discretion by the trial court in finding that defendant was predisposed to engage in drug trafficking.

Accordingly, for the reasons expressed above, the judgment of the trial court is affirmed.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.