THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KRZYSZTOF S. WATYCHA, Defendant-Appellant.

Second District   No. 2—94—0871

Opinion filed May 31, 1995.

Daniel P. Cummings, of Oakbrook Terrace, for appellant.

Anthony M. Peccarelli, State's Attorney, of Wheaton (William L. Browers, John X. Breslin, and Lawrence M. Kaschak, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Krzysztof Watycha, was charged in a four-count indictment with unlawful delivery of more than 200 but less than 600 objects containing LSD (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1401(a)(7)(B) (now 720 ILCS 570/401(a)(7)(B) (West 1992))), unlawful delivery of more than 15 but less than 100 grams of a substance containing cocaine (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1401(a)(2)(A) (now 720 ILCS 570/401(a)(2)(A) (West 1992))), unlawful delivery of fewer than 15 objects containing LSD (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1401(d) (now 720 ILCS 570/401(d) (West 1992))), and unlawful delivery of 1 gram or more but less than 15 grams of a substance containing cocaine (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1401(c)(2) (now 720 ILCS 570/401(c)(2) (West 1992))). The deliveries alleged in counts I and II took place on November 3, 1992; the deliveries alleged in counts III and IV occurred on October 28, 1992. A jury found defendant guilty on counts I and II but not guilty on counts III and IV and defendant was sentenced to nine years' imprisonment in the Department of Corrections. Following the denial of his post-trial motion, defendant filed this timely appeal.

The evidence presented at trial revealed the following facts. On April 4, 1991, Michael Maruszak (Maruszak) was charged with selling cocaine to Agent John Bright of the Du Page Metropolitan Enforcement Group (DuMEG) on two occasions, February 6, 1991,

and February 13, 1991. Both were Class X felonies. In return for a bond reduction that permitted him to obtain his release from the Du Page County jail, Maruszak agreed to cooperate with DuMEG by working as an informant. Under the agreement, DuMEG and the State's Attorney's office would attempt to get "consideration" for Maruszak when he was sentenced on the two Class X charges in exchange for his guilty plea and information leading to the arrest of at least one individual.

According to Maruszak's trial testimony, he entered into this agreement merely to secure his release on bond from the Du Page County jail and had no intention of assisting DuMEG. Rather, Maruszak testified, he was desperate to avoid the penitentiary and was attempting to delay his sentencing for as long as possible. Maruszak testified that following his release on bond, he "played games" with Agent Bright by giving him bits of information that resulted in no arrests.

In January 1992, Maruszak entered the first of several blind guilty pleas on the two Class X charges pending against him. Over the next several months, he succeeded in withdrawing his guilty plea on several occasions, avoiding sentencing each time. Maruszak testified that each plea and subsequent withdrawal was part of a continuing attempt to delay disposition of his case. By the fall of 1992, Maruszak realized that, although he had successfully avoided being sentenced for months, he would likely receive a lengthy prison term when his sentencing occurred unless he could produce information leading to an arrest. Accordingly, he resolved to introduce defendant to Agent Bright.

Maruszak testified that he first met defendant at Lewis University late in the summer of 1991. Defendant was a student at Lewis, majoring in mathematics and physics, and was due to graduate in December 1992. Although Maruszak was not a student, he visited the Lewis campus frequently and had a number of friends who were students there. Maruszak stated that he began to become friends with defendant in August 1992, about a year after their first meeting. Between August and October 1992, Maruszak and defendant became quite close. They spoke on the phone nearly every day and Maruszak often visited defendant on campus.

According to Maruszak, defendant was interested in selling drugs when they first met. Although Maruszak admitted that he had never seen defendant selling drugs, he testified that defendant had a reputation on campus as a drug dealer. Maruszak testified that at some point in the fall of 1992 he realized that defendant would be the perfect person to use to fulfill his bargain with the State's Attorney.

He decided to introduce defendant to Agent Bright, hoping that a drug transaction would occur, leading to defendant's arrest and fulfillment of the plea agreement.

Defendant, on the other hand, testified that he never had any interest in selling drugs and that he only agreed to consider it in response to Maruszak's repeated urging. Defendant, who emigrated from Poland at the age of 14, stated that he befriended Maruszak because they had a bond stemming from their shared Polish heritage. Defendant admitted that he became aware that Maruszak sold drugs shortly after they met. However, defendant stated that he told Maruszak he wanted nothing to do with the drug business and that, at first, Maruszak respected defendant's position.

Defendant testified, however, that after he mentioned to Maruszak that one of his co-workers sold drugs, Maruszak began to encourage defendant to sell drugs as well. At some point, defendant told Maruszak that he was having trouble paying his tuition, that his mother was working two jobs to help him, and that he was having financial problems. According to defendant, after learning of defendant's financial problems, Maruszak took a keen interest in convincing him to sell drugs. Eventually, Maruszak arranged a meeting between defendant and Agent Bright, which occurred at the Du Page Inn in Downers Grove on October 14, 1992. At this meeting, defendant and Agent Bright discussed the possibility of future drug transactions and exchanged phone numbers.

Between October 16, 1992, and October 28, 1992, despite instructions from Bright to avoid contact with defendant, Maruszak telephoned defendant on many occasions. Defendant testified that during this time Maruszak repeatedly urged him to sell drugs, told him that he was stupid if he let such a lucrative opportunity pass him by, and told him that he could make things easier for his mother by selling drugs. According to defendant, following the October 14 meeting at the Du Page Inn, Maruszak's attempts to convince him to sell drugs intensified. He stated that between October 18 and October 20, he spoke to Maruszak about four to five times per day and that during these conversations Maruszak strongly encouraged defendant to go through with the drug deal. Defendant also testified that, in addition to the calls he received from Maruszak, Agent Bright called him about seven to eight times following the October 14 meeting.

Agent Bright admitted that after the October 14 meeting, he called defendant "a couple of times." Bright further stated that during one phone conversation defendant told him that he was busy with midterms but that they could meet on October 28. On October 28, 1992, at approximately 4 p.m., Agent Bright and defendant met

at the Du Page Inn. Maruszak was not present at this meeting. Defendant sold Agent Bright 1.75 grams of cocaine for $80 and six doses of LSD for $20. According to Bright, defendant also showed him a much larger "rock" of cocaine and a vial of LSD tablets that he said were promised to other customers.

Meanwhile, in October 1992, Jeff Henzler (Henzler) volunteered to serve as an informant for the Burr Ridge police department to "work off" theft and drug charges. He gave the Burr Ridge police the names of three people he believed to be drug dealers, including that of defendant. At trial, Henzler testified that he met defendant late in the summer or early in the fall of 1992 at Lewis University, where a friend of Henzler's, Tray Pecket, was a student. According to Henzler, in October 1992, while visiting the Lewis campus, he witnessed a drug transaction between defendant and Tray Pecket.

After obtaining defendant's name from Henzler, the Burr Ridge police arranged for Henzler to make a controlled purchase of marijuana from him, which occurred on October 23, 1992. Following this transaction, on October 26, 1992, Henzler introduced defendant to undercover Corporal Jerry Karceski of the Burr Ridge police department. That evening, Henzler, Karceski, and defendant met at a Shell gas station on Route 83 in Burr Ridge. According to Karceski's testimony, defendant asked what price Karceski was paying for cocaine. When Karceski told him the price he normally paid, defendant said he could do better and offered to become Karceski's supplier. Defendant then sold Karceski nine doses of LSD. In addition, he explained to Karceski his preferred method for ingesting LSD and provided certain code words to use when talking about drugs on the telephone. Finally, defendant gave Karceski a "$20 bag" of cocaine as a free sample and stated that he could supply large amounts of marijuana as well.

On October 28, 1992, Karceski paged defendant and they arranged to meet later so that Karceski could purchase 25 doses of LSD for $100. At 8 p.m. that evening, they met at the Shell gas station in Burr Ridge and Karceski purchased the 25 doses of LSD. According to Karceski's testimony, defendant then asked how much cocaine Karceski wanted to buy. Defendant told Karceski that $600 would buy just over one-half ounce and that one-eighth ounce of cocaine, an "8-ball," would cost $150. Defendant then produced four 8-balls that he said were "going out" that night to other customers. Karceski asked defendant how many doses of LSD he would have to buy to get a price of $3 per dose. Defendant replied that he would have to buy at least 50 doses to get that price and showed him a vial which he said contained 50 doses of LSD. Defendant also stated that he could

get marijuana for $135 an ounce. Approximately one-half hour after they parted that night, defendant paged Karceski to tell him that in addition to the other drugs they discussed he could get hallucinogenic mushrooms.

Karceski testified that on Friday, October 30, 1992, defendant called to ask if Karceski was "set" for drugs that weekend. Karceski replied that he did not need anything for the weekend but said that he would call defendant on Monday. Defendant then told Karceski that, if he was interested, he could get a full ounce of cocaine for $950. On Monday, November 2, 1992, Karceski called defendant to verify the price for an ounce of cocaine and to ask the price for 200 doses of LSD. Defendant said that he could get one ounce of cocaine for $950 and 200 doses of LSD for $540. They agreed to meet at the Shell gas station in Burr Ridge at 6:30 p.m. on November 3, 1992.

On November 3, defendant and Karceski met as planned in the Shell parking lot. Defendant told Karceski that he wanted to pat him down before the transaction occurred. After patting Karceski down, defendant informed him that he brought less than one ounce of cocaine to sell because he "did his research" and believed that delivery of one ounce of cocaine was a Class X felony, whereas the delivery of a lesser amount was not. Defendant then pulled out a small scale to weigh the cocaine. The scale showed there to be 18 grams of cocaine. Karceski paid defendant for the drugs and then signalled to other officers waiting nearby. Defendant was arrested immediately and taken to the Burr Ridge police station.

On appeal, defendant makes five principal contentions. He contends that (1) the jury's acquittal on the October 28 charges requires acquittal as a matter of law on the November 3 charges; (2) the trial court erred in refusing to give defendant's proffered jury instructions on entrapment; (3) the trial court erred by incorrectly answering a question tendered by the jury during deliberations; (4) the trial court erred in denying defendant's motion to suppress evidence; and (5) the prosecutor's closing argument was so improper as to warrant reversal. Our discussion of defendant's fourth and fifth contentions is nonprecedential and is, therefore, not published. See Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23(b), eff. July 1, 1994.

Defendant's first contention is that the State failed to disprove his defense of entrapment as a matter of law. Defendant posits that under *Jacobson v. United States* (1992), 503 U.S. 540, 118 L. Ed. 2d 174, 112 S. Ct. 1535, if the defense of entrapment is raised, the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the offense charged prior to first being approached

by a State agent or informant. According to defendant, his acquittal on counts III and IV of the indictment demonstrates that the jury found he was not disposed to commit the unlawful delivery of a controlled substance as of October 28, 1992, approximately two months after his first significant contact with DuMEG's informant, Michael Maruszak. Defendant argues that if he was still not disposed to sell drugs as of October 28, 1992, he could not have been disposed to do so prior to his first contact with Maruszak in September 1992. Thus, defendant concludes that under *Jacobson* his acquittal on the October 28 charges necessarily requires his acquittal on the November 3 charges because both dates are well after his first contact with State informants.

In response, the State argues that under established Illinois case law, where a defendant is charged with multiple offenses in an ongoing course of criminal conduct, a jury may find him to be entrapped as to certain offenses but not as to others. According to the State, therefore, whether an initial entrapment continues through a series of criminal transactions is a factual question ultimately to be decided by the jury. The State maintains that *Jacobson* should not be read to vitiate this rule.

The entrapment defense is found in section 7—12 of the Criminal Code of 1961:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (720 ILCS 5/7—12 (West 1992).)

Once the entrapment defense is raised, the burden is on the prosecution to prove beyond a reasonable doubt that entrapment did not occur. (*People v. Draheim* (1993), 242 Ill. App. 3d 80, 88.) To support a finding of entrapment, the evidence must reveal (1) the State improperly induced the defendant to commit the crime; and (2) a lack of predisposition to commit the crime on the defendant's part. (*Draheim*, 242 Ill. App. 3d at 88; *People v. Lambrecht* (1992), 231 Ill. App. 3d 426, 434.) The entrapment defense is unavailable where the State has merely provided the defendant an opportunity to commit the crime; consequently, the defendant's predisposition is generally the critical inquiry. (*People v. Alcala* (1993), 248 Ill. App. 3d 411, 418.) Thus, in order to sustain its burden of proving that a defendant was not entrapped, the State must show that the defendant was ready

and willing to commit the crime in the absence of any persuasion from agents of the State. (*Draheim*, 242 Ill. App. 3d at 88; *People v. D'Angelo* (1992), 223 Ill. App. 3d 754, 775.) The question of whether a defendant has been entrapped is a factual question ultimately to be decided by the trier of fact. *People v. Tipton* (1980), 78 Ill. 2d 477, 487; *People v. Singletary* (1992), 237 Ill. App. 3d 503, 506.

Illinois courts have recognized that in cases involving multiple drug transactions the trier of fact is required to determine separately whether the State has disproved the defense of entrapment with respect to each charged offense. (See, *e.g.*, *People v. Martin* (1991), 219 Ill. App. 3d 1064, 1077; *People v. Keen* (1990), 206 Ill. App. 3d 940, 949-50; *People v. Washington* (1987), 154 Ill. App. 3d 648, 653-54.) As the court in *Keen* stated: "[t]hat a defendant has been found not guilty as to an initial delivery of a controlled substance in a case where defendant raises the defense of entrapment does not mandate a finding that defendant was entrapped as to a subsequent delivery." (*Keen*, 206 Ill. App. 3d at 950.) This rule is also followed by the United States Court of Appeals. See *United States v. Khubani* (2d Cir. 1986), 791 F.2d 260, 264 ("an initial entrapment does not 'immunize [one] from criminal liability for subsequent transactions that he readily and willingly undertook' "), quoting *United States v. North* (9th Cir. 1984), 746 F.2d 627, 630.

While acknowledging the existence of the above authority, defendant argues that the United States Supreme Court effected a significant change in the law of entrapment in *Jacobson v. United States* (1992), 503 U.S. 540, 118 L. Ed. 2d 174, 112 S. Ct. 1535. Defendant focuses on *Jacobson*'s statement that "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act *prior to first being approached by Government agents*." (Emphasis added.) (*Jacobson*, 503 U.S. at 549, 118 L. Ed. 2d at 184, 112 S. Ct. at 1540.) According to defendant, this statement means that, in an entrapment case involving a series of criminal transactions, a finding of entrapment as to one transaction requires a finding of entrapment as to all subsequent transactions, thus impliedly abrogating the Illinois rule set forth in cases such as *Keen* and the Federal rule found in *Khubani*.

In *Jacobson*, the petitioner ordered from a bookstore two "Bare Boys" magazines which contained photographs of nude preteen and teenage boys. (503 U.S. at 542-43, 118 L. Ed. 2d at 180, 112 S. Ct. at 1537.) The magazines did not depict any sexual activity. At the time the petitioner ordered and received these magazines, such conduct was not prohibited by Federal law. Subsequently, Congress passed the Child Protection Act of 1984 (18 U.S.C. § 2251 *et seq.* (1988)),

which criminalized the receipt through the mails of sexually explicit depictions of children. After finding the petitioner's name on the bookstore's mailing list, government agents began sending him mail from five different fictitious organizations and a bogus pen pal, essentially exploring his willingness to break the law. Many of the mailings emphasized political goals and stated that the organizations they represented were dedicated to protecting sexual freedom and freedom of choice through lobbying efforts. *Jacobson*, 503 U.S. at 545, 118 L. Ed. 2d at 182, 112 S. Ct. at 1538-39.

After $2^1/2$ years of these mailings, the government sent the petitioner a letter decrying censorship and invasions of privacy along with a catalog featuring, among other things, magazines depicting young boys engaged in sexual activities. Petitioner ordered one of the magazines, a publication entitled "Boys Who Love Boys" and following a controlled delivery he was arrested. A subsequent search of the petitioner's home revealed no evidence other than the materials sent to him by government agents and the Bare Boys magazines. *Jacobson*, 503 U.S. at 546-47, 118 L. Ed. 2d at 183, 112 S. Ct. at 1539-40.

Following a conviction and affirmance by the court of appeals, the Supreme Court reversed. Initially, the Court noted that "[i]n their zeal to enforce the law *** Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." (*Jacobson*, 503 U.S. at 548, 118 L. Ed. 2d at 184, 112 S. Ct. at 1540.) The Court went on to state that where the defense of entrapment is raised, "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." (*Jacobson*, 503 U.S. at 549, 118 L. Ed. 2d at 184, 112 S. Ct. at 1540.) The Court held that the government had not met this burden, noting that all of the evidence against the petitioner had been developed during the 26-month period during which he was bombarded with mailings from government agents. (*Jacobson*, 503 U.S. at 551, 118 L. Ed. 2d at 185-86, 112 S. Ct. at 1541-42.) The preinvestigation evidence of the petitioner's disposition to acquire unlawfully child pornography consisted solely of petitioner's receipt and possession of the Bare Boys magazines. The Court noted, however, that the receipt of these magazines did nothing to establish a predisposition to violate the law because, in ordering them, the petitioner was acting legally under the law as it existed at the time. *Jacobson*, 503 U.S. at 550, 118 L. Ed. 2d at 185, 112 S. Ct. at 1541.

■ Turning to the present case, defendant argues that in light of *Jacobson* the prosecution had to prove that he was disposed to sell

drugs prior to September 1992, his first contact with Maruszak. Consequently, he reasons, the jury's finding of entrapment—and by implication no predisposition to sell drugs—as to the October 28 charges necessarily requires the same result as to the November 3 charges because both sets of charges occurred after defendant's first contact with Maruszak. However, any statements by the *Jacobson* Court regarding the issue of predisposition must be viewed in light of the particular facts of that case. In arguing that the result in *Jacobson* controls the present case, defendant fails to take note of important factual circumstances which distinguish the case at bar from *Jacobson*.

Defendant fails to appreciate the fact that the October 28 and November 3 charges arose from two separate investigations premised on information from two different informants. Defendant's October 28 drug deliveries to Agent Bright of DuMEG, of which he was acquitted, arose out of defendant's contacts with Michael Maruszak. By contrast, defendant's November 3 drug deliveries to Corporal Karceski of the Burr Ridge police, of which he was convicted, stemmed from the information provided by Jeff Henzler. Although DuMEG and the Burr Ridge police became aware of each other's activities at some point during their respective investigations, there was ample evidence from which the jury could conclude that the two investigations were separate. For example, although defendant stated that he believed Maruszak and Henzler to be friends, both Henzler and Maruszak contradicted this testimony and stated that they did not know each other. Similarly, Karceski testified that even after he discovered that DuMEG was investigating defendant, he did not know Agent Bright was using Maruszak as an informant.

Based on the evidence presented the jury could, and presumably did, reasonably conclude that Maruszak's persistent attempts to persuade defendant to sell drugs caused defendant to become disposed to sell drugs to Agent Bright on October 28. However, the jury could also reasonably conclude that defendant's eagerness to set up a drug deal with Karceski on November 3 was not the product of any persuasion on the part of Maruszak, Henzler, or Karceski and instead reflected defendant's independent disposition to sell drugs.

In fact, the evidence adduced at trial indicates that neither Henzler nor Karceski used any persuasion to convince defendant to sell drugs to Karceski. Rather, the evidence indicates that in his dealings with Karceski defendant was an enthusiastic and willing seller who was anxious to become Karceski's permanent supplier of cocaine and LSD. On October 26, 1992, the date of their first meeting, defendant took the initiative and asked Karceski what prices he typically paid

for cocaine. After Karceski told him how much he had been paying, defendant offered a better price, urged Karceski to make him his cocaine supplier, and provided a free $20 sample of cocaine. Two days later, they met again, and defendant gave Karceski detailed information on pricing and available quantities of LSD. Later, on October 30, defendant phoned Karceski to ask if he was "set" for the weekend and quoted a price of $950 for an ounce of cocaine. Finally, on November 3, defendant consummated the final transaction without any hint of hesitation. All of this activity occurred independently of any persuasion or inducement by either of the State's informers.

The evidence summarized above is markedly different from the evidence before the Court in *Jacobson*. There, although two government agencies were involved, all of the mailings and solicitations were conceived and executed as part of the same investigative effort. Because *Jacobson* involved a single, $2^1/2$-year, highly coordinated investigation, the Court was able to conclude that any disposition to break the law that the petitioner may have had was solely the product of that investigation. See *Jacobson*, 503 U.S. at 550, 118 L. Ed. 2d at 185, 112 S. Ct. at 1541.

Further, the petitioner in *Jacobson* was, at most, a reluctant consumer of child pornography: it took 26 months of repeated mailings and communications from governmental agents before he was willing to break the law. This is in contrast to the present case where, in his dealings with Karceski, defendant entered into negotiations and completed drug transactions without hesitation. In fact, the *Jacobson* Court recognized the unique nature of the facts before it and their dissimilarity to routine drug investigations where defendants promptly take advantage of government-provided opportunities to sell drugs:

"[A]n agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs and, if the offer is accepted, make an arrest on the spot or later. In such a typical case, *** the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Jacobson*, 503 U.S. at 549-50, 118 L. Ed. 2d at 185, 112 S. Ct. at 1541.

We find the above language to be applicable to the present case. After being introduced to Karceski, defendant showed himself to be nothing if not an enthusiastic seller of illegal drugs. Without being subjected to any persuasion, he volunteered information regarding the price, available quantity, and quality of his product. When presented with opportunities to execute drug transactions, defendant took advantage of them without any apparent reluctance. Our review

of the record demonstrates that the present case, unlike *Jacobson*, is akin to a typical drug "sting" where the defendant's ready commission of the crime amply demonstrates his predisposition. Accordingly, we follow the established rule governing the invocation of the entrapment defense in cases involving multiple transactions and hold that "[w]hether an initial entrapment continues through a series of criminal transactions is a factual question for the jury." (*Martin*, 219 Ill. App. 3d at 1077.) Given that the question of whether defendant was entrapped as of November 3 was for the jury to decide, we find that their guilty verdict as to those deliveries is supported by sufficient evidence. See *People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Nuccio* (1994), 263 Ill. App. 3d 315, 317 (holding that conviction will not be overturned based on sufficiency of evidence unless, viewing all evidence in light most favorable to prosecution, it is so improbable or unsatisfactory that no rational jury could have found guilt beyond a reasonable doubt).

Having determined that the verdict of not guilty as to counts III and IV does not require a not guilty verdict as a matter of law for counts I and II, we may briefly dispose of defendant's second and third contentions. Defendant's second contention is that the trial court erred by giving the Illinois Pattern Jury Instruction (IPI) on entrapment and in refusing his non-IPI instruction based on *Jacobson*. In effect, defendant's proposed instructions stated that the State must prove beyond a reasonable doubt that defendant was disposed to commit the offenses charged prior to being approached by any government agent.

■ The decision whether to give a non-IPI instruction is within the discretion of the trial court and the court may properly refuse such an instruction where an IPI instruction is given which addresses the same issue. (*People v. Daniels* (1992), 264 Ill. App. 3d 465, 469.) As we stated above, instructions based on *Jacobson* are not appropriate in the present case because of the factual dissimilarity between the present facts and those in *Jacobson*. Accordingly, we find no abuse of discretion in the trial court's decision to provide the jury with the IPI instruction on entrapment and to reject defendant's proposed instructions. See *Daniels*, 264 Ill. App. 3d at 469.

Defendant's third contention is that the trial court erred when it improperly answered a question tendered by the jury foreman during the deliberations. The jury's question was handwritten on a sheet of paper and read:

> "Could you please interpret page 16 [of the jury instructions] for us. If there is entrapment from the beginning does it follow through on all the charges[?] Could it be entrapment on one date and not another[?]"

The trial court provided the following response to this question:

"Later offenses may or may not be the product or continuation of an initial entrapment. It is for the jury to determine with respect to each charge whether the State has proven beyond a reasonable doubt that the defendant was not entrapped."

■ We find no error in this response. As we determined above, whether a defendant is entrapped as to one offense is not dispositive as to subsequent offenses. (*Keen*, 206 Ill. App. 3d at 949-50.) Thus, the trial court's answer to the jury's question was an accurate statement of the law.

Additionally, we find support for our conclusion in *People v. Washington* (1987), 154 Ill. App. 3d 648, where the jury posed a question virtually identical to the question in the present case. In *Washington*, the defendant was charged with two armed robberies. During deliberations, the jury asked: " 'If the original offense that is done is due to entrapment, is any subsequent offense due to the original entrapment or should it been [*sic*] considered separately?' " (*Washington*, 154 Ill. App. 3d at 651.) The trial court in *Washington* answered the question by instructing the jury to review the evidence and the original jury instructions. In affirming, the appellate court stated that "whether or not an initial entrapment continues through a series of criminal transactions is a question of fact for the jury to determine." (*Washington*, 154 Ill. App. 3d at 653.) The holding in *Washington* was later followed by other panels of the appellate court in *Martin* and *Keen*. As we noted above, we agree with those courts and hold that the trial court's answer to the jury's question in the present case was entirely appropriate.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

RATHJE and HUTCHINSON, JJ., concur.