First Division





















1-95-1895

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
 ) Circuit Court
 Plaintiff-Appellee, ) of Cook County.
 )
 v. )
 )
MARCO SALAZAR and DAVID CORRAL, ) Honorable
 ) Dennis Dernbach,
 Defendant-Appellant. ) Judge Presiding.



 JUSTICE BUCKLEY delivered the opinion of the court:

 Following a jury trial, defendants, Marco Salazar and David
Corral, were found guilty of the delivery of a controlled
substance. Defendant, Marco Salazar, was also found guilty of
possession of a controlled substance. The State later nolle
prossed Salazar's possession count, and defendants were sentenced
to 25 years in the Illinois Department of Corrections. 
 Defendants raise several issues on appeal. However, because
we find the State did not prove beyond a reasonable doubt that
defendants were not entrapped, we do not address defendants'
remaining arguments.
BACKGROUND
 The following testimony was elicited at trial. Detective
Oscar Aguilara testified that in November 1992, he was working in
the organized crime intelligence section of the Chicago police
department. At that time, he was contacted by Rebecca Hernandez,
whom he had been introduced to by a paid informant, Eva
Cervantes. Detective Aguilara testified that when he met
Hernandez he posed as a drug dealer and was not in uniform. 
Hernandez told Detective Aguilara that she knew an individual
from Durango, Mexico, who could acquire a kilogram of cocaine. 
Detective Aguilara testified that Durango was a known drug
source. Hernandez was not paid for this information, although
Detective Aguilara testified that Cervantes was paid for the
information in this case. 
 According to Detective Aguilara, on December 26, 1992,
someone beeped him and when he returned the call, Corral answered
the phone. During this conversation Corral agreed to sell
Aguilara one kilogram of cocaine on December 29. Detective
Aguilara testified that Corral set the price at $22,000, and the
price of cocaine at that time in Chicago was between $19,000 and
$24,000 per kilogram. Corral did not phone Detective Aguilara on
December 29. When Detective Aguilara phoned Corral, Corral told
him that he was unable to get the cocaine. Detective Aguilara
told Corral that he had the money and that Corral should call him
when he had the drugs.
 Detective Aguilara stated that on January 3, 1993, Corral
phoned Detective Aguilara. They agreed to meet on January 6, at
11:00 a.m. at a motel located at 920 West Foster Avenue for the
exchange. Detective Aguilara confirmed the price of $22,000, and
they discussed the quality of the cocaine. Detective Aguilara
told Corral that he would have another person with him and they
would be driving a red Chevrolet Lumina Van. Corral stated that
he would be in a blue Pontiac.
 Detective Aguilara further testified that they met at the
motel as planned. Detective Aguilara and his partner, Detective
Colon, parked the van next to defendants' car and they exchanged
greetings. Detective Aguilara then asked the defendants if they
wanted to get in the van. Upon entering the van, Detective
Aguilara introduced Detective Colon as his partner and they
exchanged greetings again. Defendants then asked to see the
money and Detective Aguilara reached into a brown paper bag and
handed Corral a bundle of bills. Corral started to count the
money and Detective Aguilara handed Corral a second bundle and
asked to see the cocaine. Corral instructed Salazar to give
Detective Aguilara the cocaine. Salazar pulled a plastic bag out
of his jacket and handed it to Detective Aguilara, who then gave
it to Detective Colon.
 At this point, Detective Aguilara signaled the surveillance
officers, who came and arrested both defendants. The officers
found additional cocaine folded inside a $5 bill on Salazar. 
Detective Aguilara explained that drug dealers often carry a
sample of cocaine if the buyer needs to confirm the quality. 
Detective Aguilara also stated that neither defendant ever
indicated that he did not want to make the transaction. However,
defendants also did not indicate that they would like to engage
in further transactions with Detective Aguilara.
 The parties stipulated that the package defendant Salazar
handed to the detectives was 91.1% pure cocaine weighing 975.9
grams. The cocaine Salazar had inside the $5 bill was .11 grams
of 95% pure cocaine.
 Chicago Police Officer Richard Sanchez was qualified as an
expert in the field of cocaine distribution and packaging. He
testified that in order to get a kilogram of cocaine, a person
had to know somebody in the narcotics business and gain their
confidence. Officer Sanchez testified that only a distributor of
cocaine, someone with access to multiple kilograms, would be able
to sell kilogram quantities of 91% pure cocaine. He stated this
would only be possible for people who are inside a drug
organization.
 The defense called Rebecca Hernandez to testify. Hernandez
stated that she worked at Fairplay Foods grocery store with
defendants during December 1992 and January 1993. She also
worked with a confidential informant, Eva Cervantes, during that
time. Cervantes told Hernandez that she worked for the
government, and if Hernandez could provide her with names of
narcotics dealers, she would give her one half of the money she
received. Hernandez testified that she approached defendants in
December 1992, and asked them if they knew anyone who sold drugs. 
When she asked Corral, he appeared shocked and surprised. She
asked defendants a total of 10 or 11 times about obtaining drugs. 
Hernandez stated that defendants did not agree to produce drugs
the first 10 times she asked and Cervantes told her to push
harder. Defendants finally told Hernandez that they would look
for drugs for her.
 Hernandez further testified that Cervantes wanted to meet
defendants and the two of them met with Corral in the parking lot
of Fairplay Foods. She stated that at this time, Corral agreed
to make a drug transaction, but he did not go through with it. 
Hernandez testified that prior to approaching defendants, she
never saw them use, sell, or talk about drugs.
 On cross-examination, Hernandez testified that defendants
were not friends or neighbors. They were co-workers, and she did
not spend time with them socially. She stated she had never been
arrested and no one offered to help her with a pending case in
exchange for the information. Hernandez stated that in December
1992, and January 1993, she did not know Detective Aguilara was a
Chicago Police Officer, but she did know he worked for the
government and thought he worked with the Drug Enforcement
Agency. Hernandez stated that she told defendants that Detective
Aguilara was upset about the failure of the December 29
transaction after her mother told her that he was upset. She
explained that her mother was also an informant working for
Detective Aguilara. However, Hernandez was not working as an
informant at that time.
 Defendant Corral also called Donna Schwarz and John Martinez
to testify. Schwarz testified that she was defendant's counselor
at Farragut High School for four years. Defendant was a good
student, who graduated in the top 10% of his class, and he was a
"very truthful individual," in her opinion. At the time of
trial, Martinez was the assistant director for Hispanic programs
at Chicago State University. He testified that he met Corral in
the fall of 1992, and that he knew him to be truthful. Martinez
also stated on cross-examination that he was not a social friend
of defendant and did not see him outside of school.
 Defendant Salazar testified on his own behalf. He admitted
that he acquired the kilogram of cocaine, but said he did not
package it. He stated that Rebecca Hernandez first approached
him in the middle of December 1992, and she approached him and
Corral numerous times and asked them if they knew of a drug
source. Salazar denied ever talking about or using drugs at
Fairplay or in front of Hernandez. He also denied ever having
dealt or bought drugs before. When Hernandez first approached
him he told her that he did not know any drug dealers, but later
told her he knew where he could get drugs.
 Salazar further testified that he and Corral never set up
the meeting to sell cocaine to Cervantes or Detective Aguilara. 
He claimed he only participated in the delivery as a favor to
Hernandez and her mother. After the first transaction did not go
through, Hernandez was "real upset" and told Salazar that they
should not be "playing with" Detective Aguilara. Salazar stated
that the source of the cocaine was "Julio," whom Salazar met in a
pool hall five or six months before the transaction. He
testified that he had never bought drugs from Julio before.
 On cross-examination, Salazar admitted that he possessed a
small amount of cocaine at the time of his arrest, in addition to 
the kilogram he delivered. He stated that Julio told him to give
the additional cocaine to Aguilara as a sample. Salazar further
testified that he only met Cervantes once at Fairplay and later
the same day at her house. She never gave him any money to
procure the cocaine. Salazar stated the he and Corral did not
give Julio any money for the cocaine.
 Defendant Corral testified that he was a student at Chicago
State University and had never used drugs. Although the trial
court precluded the defense from admitting evidence that
defendants had no prior criminal record, Corral was permitted to
testify that he was never involved in any type of criminal case
prior to the case at bar. He stated that he did not agree to
provide drugs the first 8 or 13 times Hernandez approached him. 
After he finally agreed, he went to Eva Cervantes' house, where
she phoned Detective Aguilara and handed him the phone. 
Detective Aguilara told him that he was a drug dealer and wanted
to buy cocaine. According to Corral, Hernandez told him that he
could make a lot of money for doing the deal, but never told him
a specific amount.
 On cross-examination, Corral testified that Julio was a
close friend, but that he discovered only a few days prior to
going to Cervantes' house that Julio was a drug dealer. Corral
stated that Julio fronted the cocaine and set the price, and
defendant was to return the money to him.
 Following all the testimony, the jury returned a guilty
verdict on all counts. Defendants' motions for new trials were
denied on May 8, 1995, and the State nolle prossed defendant
Salazar's possession of a controlled substance charge at the
trial court's request. The court sentenced both defendants to 25
years in the Illinois Department of Corrections.
DISCUSSION
 Defendants argue that the State failed to prove beyond a
reasonable doubt that they were not entrapped. The Illinois
entrapment statute provides:
 "A person is not guilty of an offense if his
 conduct is incited or induced by a public
 officer or employer, or agent of either, for
 the purpose of obtaining evidence for the
 prosecution of such person. However, this
 section is inapplicable if a public officer
 or employee, or agent of either, merely
 affords to such person the opportunity or
 facility for committing an offense in
 furtherance of a criminal purpose which such
 person has originated." 720 ILCS 5/7-12
 (1992).
 In order to rely on the defense of entrapment, a defendant
must admit to committing all the elements of the charged offense. 
People v. Landwer, 166 Ill. 2d 475, 488, 655 N.E.2d 848, 855
(1995). Once the defendant raises entrapment as an affirmative
defense and presents some evidence thereon, the State must prove
the absence of entrapment beyond a reasonable doubt. People v.
Aguilar, 218 Ill. App. 3d 1, 7, 578 N.E.2d 109, 113 (1991). The
question of entrapment is one for the trier of fact, and the
determination will not be set aside unless entrapment exists as a
matter of law. People v. Day, 279 Ill. App. 3d 606, 611, 665
N.E.2d 867, 870 (1996). Thus, this court must view the evidence
in a light most favorable to the prosecution and determine
whether any rational trier of fact could have found the elements
essential to the criminal conviction beyond a reasonable doubt. 
Day, 279 Ill. App. 3d at 611, 665 N.E.2d at 871.
 "To support a finding of entrapment the evidence must reveal
(1) the State improperly induced the defendant to commit the
crime; and (2) a lack of predisposition to commit the crime on
the defendant's part." People v. Watycha, 272 Ill. App. 3d 774,
780, 651 N.E.2d 659, 664 (1995). The critical inquiry in an
entrapment case is whether the "criminal purpose" originated with
the defendant. People v. Cross, 77 Ill. 2d 396, 404, 396 N.E.2d
812, 816 (1979). Entrapment is established when the criminal
design originates with the government official; the official
implants in the mind of an innocent person the disposition to
commit the offense and induces its commission in order to
prosecute. People v. Collins, 199 Ill. App. 3d 163, 167, 556
N.E.2d 835, 837 (1990). Where a defendant already had an intent
to commit a crime and does so merely because an officer affords
him an opportunity to commit the crime or encourages him in its
perpetration, there is no entrapment. People v. Gaytan, 186 Ill.
App. 3d 919, 925, 542 N.E.2d 1163, 1167-68 (1989). Entrapment
will not be found merely because a government official initiates
a transaction with a defendant that leads to the sale of a
controlled substance. People v. Darnell, 214 Ill. App. 3d 345,
354, 573 N.E.2d 1252, 1258 (1990).
 Although the parties do not address this issue squarely, we
first need to consider whether Hernandez is considered an "agent"
of Detective Aguilara for purposes of the entrapment statute. 
Detective Aguilara testified that he posed as a drug dealer when
he met Hernandez. Hernandez testified that she thought Detective
Aguilara worked for the government, although she did not know he
was a Chicago police officer in December 1992 and January 1993. 
However, this would not keep Hernandez from being considered an
agent. People v. Wielgos, 142 Ill. 2d 133, 137, 568 N.E.2d 861,
863 (1991). The question this court must answer is whether
Hernandez induced defendants "for the purpose of obtaining
evidence of prosecution of [defendants]." Wielgos, 142 Ill. 2d
at 137, 568 N.E.2d at 863. The testimony of Hernandez shows that
the answer to this question is yes. Hernandez stated that
Cervantes told her she worked for the government and Hernandez
could make money if she could get the names of drug dealers. 
Hernandez was driven to implore defendants to deliver a kilogram
of cocaine by the possibility of being paid for obtaining
evidence for the prosecution of defendants. Thus, we consider
Hernandez an agent for purposes of the entrapment statute.
 We further find that the evidence in this case did not
beyond a reasonable doubt rebut defense evidence that defendants
were induced by the government to commit the crime. Defendants
and Hernandez testified that Hernandez had to approach defendants
10 or more times before they agreed to participate in the
transaction. When defendants cancelled the original meeting,
Hernandez was upset and told them that Detective Aguilara was not
one to "play with." This evidence weakens the State's argument
that it was defendants who initiated the January 6 meeting. The
testimony at trial indicates that the criminal purpose originated
with Cervantes and Hernandez. It was the State's burden to rebut
that testimony, and the State failed to meet its burden in this
case.
 The critical moments in this case were those around the time
Detective Aguilara was paged on December 26. Yet the State only
elicited Detective Aguilara's testimony regarding the call, which
was that he was paged by someone and Corral answered when he
returned the call. There was no evidence presented by the State
to rebut the defense testimony that Cervantes and Hernandez were
with defendants at that time, and that Cervantes made the initial
call to Aguilara. Thus, we find it particularly significant that
the State did not call Cervantes to testify. While the State was
not obligated to do so, this failure gives rise to an inference
against the State. Day, 279 Ill. App. 3d at 612, 665 N.E.2d at
871; People v. Poulos, 196 Ill. App. 3d 653, 661, 554 N.E.2d 448,
453 (1990).
 Not only did the State fail to call Cervantes to testify,
but it inferred during closing argument that Cervantes'
confidentiality prevented the State from calling her as a
witness. It is clear that this was not in fact the case and this
statement was completely improper. This statement, along with
the lack of explanation for the Cervantes' absence at trial,
further indicates to this court that the State chose not to call
Cervantes because her testimony would have supported the defense.
 The State also failed to establish beyond a reasonable doubt
that defendants were predisposed to commit the offense. 
"Generally, predisposition is established by a defendant's
willingness to participate in criminal activity before his
initial exposure to government agents." Poulos, 196 Ill. App. 3d
at 661, 554 N.E.2d at 453. Predisposition is determined by the
facts of each case. Day, 279 Ill. App. 3d at 612, 665 N.E.2d at
871. Factors commonly considered include: "(1) defendant's
initial reluctance or ready willingness to commit the crime; (2)
defendant's familiarly with drugs and willingness to accommodate
the needs of drug users; (3) defendant's willingness to make a
profit from the illegal act; (4) defendant's prior or current use
of illegal drugs; (5) defendant's participation in testing or
cutting the drugs; (6) defendant's engagement in a course of
conduct involving similar offenses; (7) defendant's ready access
to a drug supply; and (8) defendant's subsequent activities." 
Day, 279 Ill. App. 3d at 612, 665 N.E.2d at 871.
 The State relies solely on the sheer amount of cocaine sold
in this case as evidence to rebut defendants' showing that they
lacked a predisposition to engage in the drug transaction. We do
not believe this evidence satisfies the state's burden. The
State argues that one would have to be connected with the drug
trade to have access to cocaine of this amount and purity. 
However, it does not logically follow that someone connected with
the drug trade necessarily is predisposed to delivering a
kilogram of cocaine, without other evidence. It could be
possible to be "connected" with someone in the drug trade and at
the same time lack the predisposition to commit the offense.
 The evidence showed that it was Detective Aguilara who made
the demand of a kilogram of cocaine. There were no other amounts
discussed, and defendants simply delivered what Detective
Aguilara asked for in committing this offense. If we were to
affirm defendants' convictions, we would in effect be holding
that any time a defendant is tried for delivery of a kilogram of
cocaine, the entrapment defense is not available because here the
record shows an absence of any evidence regarding the other
predisposition factors. Such a holding would be both illogical
and unjust. 
 Defendants were initially reluctant to commit the offense
and backed out of the transaction on December 29. Although
defendants ultimately showed a willingness to accommodate the
needs of Detective Aguilara, there was evidence that their
actions were motivated by a desire to please Hernandez and her
mother and fear of Detective Aguilara. There is no evidence that
defendants were willing to make a profit from this transaction. 
In fact, defendants stated that it was "Julio" who set the price. 
The unrebutted testimony of defendants was that they had never
been involved in a drug-related case and they were not drug
users. There was no evidence that defendants had been engaged in
drug-related activity prior or subsequent to this offense. 
Finally, there was no evidence that defendants participated in
the cutting or testing of the drugs.
 Accordingly, for the forgoing reasons, we believe the State
failed to prove beyond a reasonable doubt that defendants were
not entrapped, and defendants' convictions are hereby reversed.
 Reversed.