THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANA SHAWN DAY, Defendant-Appellant.

Third District   No. 3—95—0483

Opinion filed May 9, 1996.

George C. Howard (argued), and Elreta C.L. Dickinson, both of George C. Howard Ltd. & Associates, of Chicago, for appellant.

James Glasgow, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MICHELA delivered the opinion of the court:

Defendant Dana Day was indicted by a Will County grand jury on two counts of unlawful delivery of a controlled substance within 1,000 feet of a public park and one count of unlawful delivery of a controlled substance within 1,000 feet of a school, and three counts of unlawful delivery of a controlled substance. 720 ILCS 570/401(c)(2), 407(b)(1) (West 1994). Defendant pled not guilty and raised the affirmative defense of entrapment. 720 ILCS 5/7—12 (West 1994). Following a jury trial, he was convicted and sentenced to concurrent terms of seven years' incarceration.

The issue presented for our review is whether the evidence adduced during the State's case in chief was sufficient to rebut the defense of entrapment beyond a reasonable doubt. For the reasons set forth below, we hold that the State's evidence did not rebut the

defense of entrapment beyond a reasonable doubt and that the defendant was entrapped as a matter of law. Accordingly, the conviction is reversed.

The Metropolitan Area Narcotics Squad (MANS) launched a police investigation called Operation Cooperation Two. The investigation utilized undercover police officers to assist neighboring police agencies by making controlled buys of crack cocaine and other drugs outside of the undercover officer's home jurisdiction. Joliet police officer Anthony White was a MANS officer who assisted the City of Bolingbrook police department with Operation Cooperation Two.

In the early summer of 1994 Marla Nobles, a former gang member, approached police authorities to discuss becoming a paid informant. Nobles was referred to special MANS agent Jeff Lockard, who recommended she become a confidential source working on Operation Cooperation Two. Nobles was paid $100 for each introduction she made between an undercover officer and an alleged drug dealer.

In May of 1994, 22-year-old defendant Dana Day returned home to Bolingbrook for the summer from the University of Wyoming. Day and Nobles met coincidentally at a J.J. Pepper's gas and convenience store in Bolingbrook where they exchanged telephone numbers to resume an eighth-grade acquaintanceship. One week later, Day was at a friend's home in Bolingbrook when Nobles arrived. Day and Nobles were speaking about going out on a date when she asked him to get her cocaine. Day refused, telling Nobles he "had nothing to do with it, I didn't want to take part in it." A few days later he ran into Nobles and she again asked him to obtain cocaine for her. Day told Nobles, "I couldn't get any drugs for her, that I wasn't engaged in anything like that." Day and Nobles also spoke on the telephone and, on at least three occasions, Nobles asked Day to obtain drugs and he again stated he could not. Day testified he was romantically interested in Nobles and they went on a date. While on their date Nobles persistently requested drugs. This time Day stated, "I don't know, I'll see what I can do. I can ask somebody, but I don't know."

On June 23, 1994, a few days after their date, Nobles paged Day at 10:10 p.m. and said she and her girlfriend wanted to meet with him and his friend Jeff Arnold at the Speedway gas station at the corner of Boughton and Schmidt Roads to "go out and do something." Day and Arnold drove in Arnold's car to the Speedway gas station, and Nobles arrived unexpectedly with her friend "Tony" (Officer White). Nobles asked Day to get some drugs for her or her friend "Tony." Day asked his friend Arnold if he knew anyone who could get drugs and Arnold replied that he knew someone in Cicero. Nobles

asked Day to get an eight ball. Day asked what an eight ball was and was told an eight ball is an eighth of an ounce of cocaine. Nobles claimed the cocaine was for her friend "Tony," who needed the cocaine as a favor. Day asked "Tony" to come to Cicero to get the cocaine. "Tony" declined to accompany Day, saying he did not know and trust him well enough to travel to Cicero. Day requested money for the cocaine, but "Tony" said he would pay for the drugs when Day returned.

When Day and Arnold returned to the Speedway gas station, Day gave "Tony" the cocaine and received $160, earning a $10 profit on the $150 eight ball of cocaine. Although the indictment alleged this delivery occurred within 1,000 feet of a public park, trial testimony revealed the delivery did not occur within the requisite 1,000 feet. Consequently, the State dismissed this charge at trial.

Agent Lockard and other Bolingbrook police officers were engaged in a mobile surveillance of the drug transaction. Agent Lockard followed Arnold's car from the Speedway to a J.J. Pepper's gas station where Day and Arnold bought gasoline. Agent Lockard then instructed Officer Hild to make a traffic stop on the car, if at all possible, to positively identify the car's occupants. Officer Hild stopped the car for speeding and obtained identification verifying Jeff Arnold and the defendant as the car's occupants.

A few days later, White paged Day and asked for more drugs. Day stated "it was possible, but I don't know. I have to make some phone calls and ask some people." White said he would travel to Bolingbrook and contact Day from the Speedway gas station. When Day received White's page, he ignored it and did not return White's call. Nobles then spoke with Day and conveyed White's distress at Day's inability to "come through for him."

On July 12, 1994, at 6:15 p.m. Officer White paged Day several times and Day finally responded to the page. White requested an eight ball and Day agreed to meet with White at the Speedway gas station located at Boughton and Schmidt Roads in Bolingbrook. At approximately 6:40 p.m. Day arrived with several other people and requested that White follow him. Day stopped at a cul-de-sac on Norman Road in Bolingbrook and delivered the cocaine to White. This delivery took place within 1,000 feet of Winston Woods, a public park. After the drugs were delivered, Day requested $150 for the cocaine, admitting he had received too much money on June 23, 1994. During the transaction, Day asked White if he was a police officer wearing a "wire." White lifted his shirt to reveal he was not wearing a listening device.

Between July 12 and July 29, 1994, Officer White paged Day sev-

eral times and Day agreed to meet him at a Popeye's chicken restaurant. While there, White requested cocaine but Day refused saying, "I just couldn't. I mean, the other times I did it was just like luck. I just knew people that may know somebody that can get drugs." White told Day, "if you can't get the dope, just let me know and I will get it from somewhere else." Day then requested White "do some dope" to prove he was not a police officer. White testified he resisted Day's suggestion by feeding Day "a script, a line *** [about how] I got enough problems, I am getting divorced and I got to pay child support, I don't need to be strung out." White testified Day then stated he was a college athlete who did not do drugs and had a four-year football scholarship to lose if he went to prison for selling drugs.

After their meeting at Popeye's, Day testified Officer White contacted him frequently and, finally, at 5:20 p.m. on July 29, 1994, Day responded to White's page. White told Day he wanted two eight balls of cocaine. At White's suggestion the delivery site was a Taco Bell restaurant at the intersection of Bolingbrook Drive and Barbers Corner, located within 1,000 feet of a school, Children's World preschool. White arrived at the Taco Bell and paged the defendant. Day was across the street at a Wendy's restaurant making arrangements to obtain the drugs. At 7:30 p.m. Day delivered two eight balls of cocaine to White at the Taco Bell. This drug transaction was captured on videotape by a MANS surveillance team.

At the end of the summer, Day transferred to a Missouri college and returned to school. In October of 1994, an arrest warrant issued for his arrest. Upon his return to Illinois Day pled not guilty and requested a trial by jury. He gave the State notice of his intent to utilize the entrapment defense at trial. At trial the State called Officer White and Agent Lockard to testify about the June 23, 1994, July 12, 1994, and July 29, 1994, drug transactions. Day testified on his behalf, as did several character witnesses during the defense's case in chief. The State presented no rebuttal evidence. The jury was properly instructed on the entrapment defense and rendered a verdict of guilty. Day filed a timely notice of appeal.

■ Day argues the evidence adduced at trial established entrapment as a matter of law and requests that the jury verdict be set aside and that his conviction be reversed. The defense of entrapment is found in section 7—12 of the Criminal Code of 1961, which states:

"A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the op-

portunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." 720 ILCS 5/7—12 (West 1994). Entrapment occurs when governmental officials originate a criminal design, implant the disposition to commit the offense in the mind of an innocent person, and induce the commission of the offense in order to obtain evidence for use in prosecuting that person. *People v. Chism*, 248 Ill. App. 3d 804, 617 N.E.2d 1333 (1993). Thus, when a defendant puts forth evidence showing (i) the State improperly induced him to commit the crime, and (ii) a lack of predisposition to commit the crime, the defendant has established the entrapment defense. *Chism*, 248 Ill. App. 3d at 811, 617 N.E.2d at 1338.

■ A defendant who raises entrapment as an affirmative defense to a criminal charge necessarily admits to committing the crime, albeit because of improper governmental inducement. *People v. White*, 249 Ill. App. 3d 57, 63, 618 N.E.2d 889, 894 (1993). Once a defendant presents some evidence, however slight, to support an entrapment defense the State bears the burden to rebut the entrapment defense beyond a reasonable doubt. *People v. Alcala*, 248 Ill. App. 3d 411, 618 N.E.2d 497 (1993); *White*, 249 Ill. App. 3d 57, 618 N.E.2d 889. Once raised, the question of entrapment is to be determined by the trier of fact. *People v. Tipton*, 78 Ill. 2d 477, 401 N.E.2d 528 (1980). The trier of fact's determination of entrapment will not be set aside unless entrapment as a matter of law exists. *People v. Saindon*, 239 Ill. App. 3d 554, 605 N.E.2d 1121 (1992). Thus, the appellate standard used to review the trier of fact's resolution of the entrapment defense is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements essential to the criminal conviction beyond a reasonable doubt. *People v. Lambrecht*, 231 Ill. App. 3d 426, 595 N.E.2d 1358 (1992).

■ Day first argues the State did not, beyond a reasonable doubt, rebut uncontroverted defense evidence that Day was induced by the government and its agents to commit the crimes for which he was convicted. We find the record consistently demonstrates that Day was repeatedly approached to obtain drugs by MANS confidential source Nobles and Officer White from approximately May of 1994 to July 29, 1994. Thus, the record supports the defense argument that the initial idea to obtain and sell drugs originated with the government. In the similar case of *People v. Fisher*, the defendant's drug conviction was reversed when uncontradicted defense testimony established that the idea to commit the offense did not originate with the defendant. *People v. Fisher*, 74 Ill. App. 3d 330, 334, 392 N.E.2d 975, 978-79 (1979).

Day's testimony remained uncontradicted that he resisted Noble's requests for drugs until June 23, 1994, and refused to respond to White's pages for drugs on numerous occasions. As in *Fisher,* this unrebutted defense testimony strongly indicates that the idea to commit a drug offense did not originate with Day and further establishes Day did not actively encourage the government's solicitations for drugs. Rather, the record reveals Nobles and White cultivated relationships with the defendant exclusively designed to induce Day to obtain drugs. We acknowledge entrapment does not exist as a matter of law merely because a government agent initiates a relationship leading to a drug transaction. *People v. Dennis,* 94 Ill. App. 3d 448, 418 N.E.2d 479 (1981). However, we find the course of criminal conduct for which the defendant was convicted initially originated in the mind of a paid government agent who, for no reason apparent from the record, arbitrarily engaged in a relationship with the defendant, and purposely encouraged its growth, as an inducement to obtain drugs. See *People v. Poulos,* 196 Ill. App. 3d 653, 659-60, 554 N.E.2d 448, 452 (1990).

It became incumbent upon the State to rebut Day's uncontradicted testimony that he did not originate the idea to engage in drug trafficking and was induced to commit the crime through improper governmental influence. Upon a review of the record, we find the State failed to proffer evidence rebutting defense evidence that Day was subjected to improper governmental inducement. In this regard, we find it significant the State did not call Nobles to testify during its case in chief or in rebuttal. While the State was under no obligation to produce Nobles to testify at trial, its failure to do so gives rise to an inference against the State. *Poulos,* 196 Ill. App. 3d at 661, 554 N.E.2d at 453. We therefore hold the State's evidence failed to rebut this prong of the entrapment defense beyond a reasonable doubt.

■ Day next argues the State failed to rebut defense evidence that established he lacked the predisposition necessary to commit the charged crimes. Predisposition is determined through a factual analysis of the case. *People v. Katsigiannis,* 171 Ill. App. 3d 1090, 526 N.E.2d 508 (1988). Factors to be analyzed include: (1) defendant's initial reluctance or ready willingness to commit the crime; (2) defendant's familiarity with drugs and willingness to accommodate the needs of drug users; (3) defendant's willingness to make a profit from the illegal act; (4) defendant's prior or current use of illegal drugs; (5) defendant's participation in testing or cutting the drugs; (6) defendant's engagement in a course of conduct involving similar offenses; (7) defendant's ready access to a drug supply; and (8) defendant's subsequent activities. *White,* 249 Ill. App. 3d at 64, 618 N.E.2d at 895.

■ We find Day put forth sufficient evidence to demonstrate the factors necessary to establish that he lacked the predisposition necessary to engage in drug trafficking. The State argues the evidence adduced during its case in chief was sufficient to rebut, beyond a reasonable doubt, defense evidence demonstrating the absence of such a predisposition. However, upon a review of the record we find the State merely presented some evidence which, when viewed in the light most favorable to the prosecution, reveals Day's passing familiarity with drugs and a limited willingness to accommodate White's needs as a drug user.

For example, White testified that on June 23, 1994, Day knew an eight ball was an eighth of an ounce of cocaine and used the drug trade term "fronted" when requesting money to purchase drugs. Additionally, the State argues Day's inquiries of whether White was a police officer and if he wore a "wire" indicate predisposition. As a further indication of predisposition, the State points to Day's willingness to establish a line of communication with White by establishing a code so Day would be aware of White's incoming pages. The State also argues Day engaged in countersurveillance techniques during several of the drug transactions. However, even when these examples are viewed in a light most favorable to the prosecution, they do not outweigh the substantial remainder of unrebutted defense evidence which tended to demonstrate Day lacked the predisposition to commit the drug offenses with which he was charged and convicted.

Using the factors listed above to establish predisposition, we find Day was not inclined to commit a criminal offense. Further, although Day made a $10 profit on June 23, 1994, from his sale to White, Day voluntarily lowered the price on the two subsequent sales to his actual cost for the drugs. Testimony also established Day did not use drugs. Additionally, no evidence was presented to establish Day cut or tested the drugs sold to White. Further, the State's evidence did not satisfactorily establish Day had a ready source of drugs. Rather, Day had to rely on his friend's knowledge of a drug source in Cicero. Moreover, White was kept waiting for two eight balls of cocaine for over two hours on July 29, 1994, despite White's testimony that an eight ball was a small amount of crack cocaine relatively easy to purchase within Will County. Finally, there was no evidence that Day had a prior criminal history of any type, but especially of drug use or drug sales, in Illinois or Wyoming.

We find the evidence, when viewed in the light most favorable to the prosecution, overwhelmingly established that Day lacked the predisposition necessary to commit the drug offenses for which he was convicted. The evidence adduced during the State's case in chief

was therefore insufficient to rebut, beyond a reasonable doubt, the second prong of the entrapment defense.

For the foregoing reasons, the judgment of the circuit court of Will County is reversed.

Judgment reversed.

HOLDRIDGE, P.J., and McCUSKEY, J., concur.