THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCO SALAZAR *et al.*, Defendants-Appellants.

First District (1st Division)   No. 1—95—1895

Opinion filed October 21, 1996.

Thomas C. Brandstrader, of Mt. Prospect, for appellants.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Mark R. Gerhardt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendants, Marco Salazar and David Corral, were found guilty of the delivery of a controlled substance. Defendant Marco Salazar was also found guilty of possession of a controlled substance. The State later nol-prossed Salazar's possession count, and defendants were sentenced to 25 years in the Illinois Department of Corrections.

Defendants raise several issues on appeal. However, because we find the State did not prove beyond a reasonable doubt that

defendants were not entrapped, we do not address defendants' remaining arguments.

## BACKGROUND

The following testimony was elicited at trial. Detective Oscar Aguilara testified that in November 1992, he was working in the organized crime intelligence section of the Chicago police department. At that time, he was contacted by Rebecca Hernandez, to whom he had been introduced by a paid informant, Eva Cervantes. Detective Aguilara testified that when he met Hernandez he posed as a drug dealer and was not in uniform. Hernandez told Detective Aguilara that she knew an individual from Durango, Mexico, who could acquire a kilogram of cocaine. Detective Aguilara testified that Durango was a known drug source. Hernandez was not paid for this information, although Detective Aguilara testified that Cervantes was paid for the information in this case.

According to Detective Aguilara, on December 26, 1992, someone beeped him and when he returned the call, Corral answered the phone. During this conversation Corral agreed to sell Aguilara one kilogram of cocaine on December 29. Detective Aguilara testified that Corral set the price at $22,000, and the price of cocaine at that time in Chicago was between $19,000 and $24,000 per kilogram. Corral did not phone Detective Aguilara on December 29. When Detective Aguilara phoned Corral, Corral told him that he was unable to get the cocaine. Detective Aguilara told Corral that he had the money and that Corral should call him when he had the drugs.

Detective Aguilara stated that on January 3, 1993, Corral phoned Detective Aguilara. They agreed to meet on January 6, at 11:00 a.m. at a motel located at 920 West Foster Avenue for the exchange. Detective Aguilara confirmed the price of $22,000, and they discussed the quality of the cocaine. Detective Aguilara told Corral that he would have another person with him and they would be driving a red Chevrolet Lumina Van. Corral stated that he would be in a blue Pontiac.

Detective Aguilara further testified that they met at the motel as planned. Detective Aguilara and his partner, Detective Colon, parked the van next to defendants' car and they exchanged greetings. Detective Aguilara then asked the defendants if they wanted to get in the van. Upon entering the van, Detective Aguilara introduced Detective Colon as his partner and they exchanged greetings again. Defendants then asked to see the money, and Detective Aguilara reached into a brown paper bag and handed Corral a bundle of bills. Corral started to count the money, and Detective Aguilara handed Corral a second bundle and asked to see the cocaine. Corral instructed Salazar to give

Detective Aguilara the cocaine. Salazar pulled a plastic bag out of his jacket and handed it to Detective Aguilara, who then gave it to Detective Colon.

At this point, Detective Aguilara signaled the surveillance officers, who came and arrested both defendants. The officers found additional cocaine folded inside a $5 bill on Salazar. Detective Aguilara explained that drug dealers often carry a sample of cocaine if the buyer needs to confirm the quality. Detective Aguilara also stated that neither defendant ever indicated that he did not want to make the transaction. However, defendants also did not indicate that they would like to engage in further transactions with Detective Aguilara.

The parties stipulated that the package defendant Salazar handed to the detectives was 91.1% pure cocaine, weighing 975.9 grams. The cocaine Salazar had inside the $5 bill was .11 grams of 95% pure cocaine.

Chicago police officer Richard Sanchez was qualified as an expert in the field of cocaine distribution and packaging. He testified that in order to get a kilogram of cocaine, a person had to know somebody in the narcotics business and gain their confidence. Officer Sanchez testified that only a distributor of cocaine, someone with access to multiple kilograms, would be able to sell kilogram quantities of 91% pure cocaine. He stated this would only be possible for people who are inside a drug organization.

The defense called Rebecca Hernandez to testify. Hernandez stated that she worked at Fairplay Foods grocery store with defendants during December 1992 and January 1993. She also worked with a confidential informant, Eva Cervantes, during that time. Cervantes told Hernandez that she worked for the government, and if Hernandez could provide her with names of narcotics dealers, she would give her one half of the money she received. Hernandez testified that she approached defendants in December 1992 and asked them if they knew anyone who sold drugs. When she asked Corral, he appeared shocked and surprised. She asked defendants a total of 10 or 11 times about obtaining drugs. Hernandez stated that defendants did not agree to produce drugs the first 10 times she asked and Cervantes told her to push harder. Defendants finally told Hernandez that they would look for drugs for her.

Hernandez further testified that Cervantes wanted to meet defendants and the two of them met with Corral in the parking lot of Fairplay Foods. She stated that, at this time, Corral agreed to make a drug transaction, but he did not go through with it. Hernandez testified that prior to approaching defendants, she never saw them use, sell, or talk about drugs.

On cross-examination, Hernandez testified that defendants were not friends or neighbors. They were co-workers, and she did not spend time with them socially. She stated she had never been arrested and no one offered to help her with a pending case in exchange for the information. Hernandez stated that in December 1992 and January 1993, she did not know Detective Aguilara was a Chicago police officer, but she did know he worked for the government and thought he worked with the Drug Enforcement Agency. Hernandez stated that she told defendants that Detective Aguilara was upset about the failure of the December 29 transaction after her mother told her that he was upset. She explained that her mother was also an informant working for Detective Aguilara. However, Hernandez was not working as an informant at that time.

Defendant Corral also called Donna Schwarz and John Martinez to testify. Schwarz testified that she was defendant's counselor at Farragut High School for four years. Defendant was a good student, who graduated in the top 10% of his class, and he was a "very truthful individual," in her opinion. At the time of trial, Martinez was the assistant director for Hispanic programs at Chicago State University. He testified that he met Corral in the fall of 1992 and that he knew him to be truthful. Martinez also stated on cross-examination that he was not a social friend of defendant and did not see him outside of school.

Defendant Salazar testified on his own behalf. He admitted that he acquired the kilogram of cocaine, but said he did not package it. He stated that Rebecca Hernandez first approached him in the middle of December 1992, and she approached him and Corral numerous times and asked them if they knew of a drug source. Salazar denied ever talking about or using drugs at Fairplay or in front of Hernandez. He also denied ever having dealt or bought drugs before. When Hernandez first approached him he told her that he did not know any drug dealers, but later told her he knew where he could get drugs.

Salazar further testified that he and Corral never set up the meeting to sell cocaine to Cervantes or Detective Aguilara. He claimed he only participated in the delivery as a favor to Hernandez and her mother. After the first transaction did not go through, Hernandez was "real upset" and told Salazar that they should not be "playing with" Detective Aguilara. Salazar stated that the source of the cocaine was "Julio," whom Salazar met in a pool hall five or six months before the transaction. He testified that he had never bought drugs from Julio before.

On cross-examination, Salazar admitted that he possessed a small

amount of cocaine at the time of his arrest, in addition to the kilogram he delivered. He stated that Julio told him to give the additional cocaine to Aguilara as a sample. Salazar further testified that he only met Cervantes once at Fairplay and later the same day at her house. She never gave him any money to procure the cocaine. Salazar stated the he and Corral did not give Julio any money for the cocaine.

Defendant Corral testified that he was a student at Chicago State University and had never used drugs. Although the trial court precluded the defense from admitting evidence that defendants had no prior criminal record, Corral was permitted to testify that he was never involved in any type of criminal case prior to the case at bar. He stated that he did not agree to provide drugs the first 8 or 13 times Hernandez approached him. After he finally agreed, he went to Eva Cervantes' house, where she phoned Detective Aguilara and handed him the phone. Detective Aguilara told him that he was a drug dealer and wanted to buy cocaine. According to Corral, Hernandez told him that he could make a lot of money for doing the deal, but never told him a specific amount.

On cross-examination, Corral testified that Julio was a close friend, but that he discovered only a few days prior to going to Cervantes' house that Julio was a drug dealer. Corral stated that Julio fronted the cocaine and set the price, and defendant was to return the money to him.

Following all the testimony, the jury returned a guilty verdict on all counts. Defendants' motions for new trials were denied on May 8, 1995, and the State nol-prossed defendant Salazar's possession of a controlled substance charge at the trial court's request. The court sentenced both defendants to 25 years in the Illinois Department of Corrections.

## DISCUSSION

■ Defendants argue that the State failed to prove beyond a reasonable doubt that they were not entrapped. The Illinois entrapment statute provides:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employer, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." 720 ILCS 5/7—12 (1992).

■ In order to rely on the defense of entrapment, a defendant must admit to committing all the elements of the charged offense. *People v. Landwer*, 166 Ill. 2d 475, 488, 655 N.E.2d 848, 855 (1995). Once the defendant raises entrapment as an affirmative defense and presents some evidence thereon, the State must prove the absence of entrapment beyond a reasonable doubt. 710 ILCS 5/7—12 (West 1992); *People v. Aguilar*, 218 Ill. App. 3d 1, 7, 578 N.E.2d 109, 113 (1991). The question of entrapment is one for the trier of fact, and the determination will not be set aside unless entrapment exists as a matter of law. *People v. Day*, 279 Ill. App. 3d 606, 611, 665 N.E.2d 867, 870 (1996). Thus, this court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements essential to the criminal conviction beyond a reasonable doubt. *Day*, 279 Ill. App. 3d at 611, 665 N.E.2d at 871.

■ "To support a finding of entrapment, the evidence must reveal (1) the State improperly induced the defendant to commit the crime; and (2) a lack of predisposition to commit the crime on the defendant's part." *People v. Watycha*, 272 Ill. App. 3d 774, 780, 651 N.E.2d 659, 664 (1995). The critical inquiry in an entrapment case is whether the "criminal purpose" originated with the defendant. *People v. Cross*, 77 Ill. 2d 396, 404, 396 N.E.2d 812, 816 (1979). Entrapment is established when the criminal design originates with the government official; the official implants in the mind of an innocent person the disposition to commit the offense and induces its commission in order to prosecute. *People v. Collins*, 199 Ill. App. 3d 163, 167, 556 N.E.2d 835, 837 (1990). Where a defendant already had an intent to commit a crime and does so merely because an officer affords him an opportunity to commit the crime or encourages him in its perpetration, there is no entrapment. *People v. Gaytan*, 186 Ill. App. 3d 919, 925, 542 N.E.2d 1163, 1167-68 (1989). Entrapment will not be found merely because a government official initiates a transaction with a defendant that leads to the sale of a controlled substance. *People v. Darnell*, 214 Ill. App. 3d 345, 354, 573 N.E.2d 1252, 1258 (1990).

Although the parties do not address this issue squarely, we first need to consider whether Hernandez is considered an "agent" of Detective Aguilara for purposes of the entrapment statute. Detective Aguilara testified that he posed as a drug dealer when he met Hernandez. Hernandez testified that she thought Detective Aguilara worked for the government, although she did not know he was a Chicago police officer in December 1992 and January 1993. However, this would not keep Hernandez from being considered an agent. *People v. Wielgos*, 142 Ill. 2d 133, 137, 568 N.E.2d 861, 863 (1991). The

question this court must answer is whether Hernandez induced defendants "for the purpose of obtaining evidence for the prosecution of [defendants]." *Wielgos*, 142 Ill. 2d at 137, 568 N.E.2d at 863. The testimony of Hernandez shows that the answer to this question is yes. Hernandez stated that Cervantes told her she worked for the government and Hernandez could make money if she could get the names of drug dealers. Hernandez was driven to implore defendants to deliver a kilogram of cocaine by the possibility of being paid for obtaining evidence for the prosecution of defendants. Thus, we consider Hernandez an agent for purposes of the entrapment statute.

We further find that the evidence in this case did not rebut beyond a reasonable doubt defense evidence that defendants were induced by the government to commit the crime. Defendants and Hernandez testified that Hernandez had to approach defendants 10 or more times before they agreed to participate in the transaction. When defendants cancelled the original meeting, Hernandez was upset and told them that Detective Aguilara was not one to "play with." This evidence weakens the State's argument that it was defendants who initiated the January 6 meeting. The testimony at trial indicates that the criminal purpose originated with Cervantes and Hernandez. It was the State's burden to rebut that testimony, and the State failed to meet its burden in this case.

The critical moments in this case were those around the time Detective Aguilara was paged on December 26. Yet the State only elicited Detective Aguilara's testimony regarding the call, which was that he was paged by someone and Corral answered when he returned the call. There was no evidence presented by the State to rebut the defense testimony that Cervantes and Hernandez were with defendants at that time and that Cervantes made the initial call to Aguilara. Thus, we find it particularly significant that the State did not call Cervantes to testify. While the State was not obligated to do so, this failure gives rise to an inference against the State. *Day*, 279 Ill. App. 3d at 612, 665 N.E.2d at 871; *People v. Poulos*, 196 Ill. App. 3d 653, 661, 554 N.E.2d 448, 453 (1990).

Not only did the State fail to call Cervantes to testify, but it implied during closing argument that Cervantes' confidentiality prevented the State from calling her as a witness. It is clear that this was not in fact the case and this statement was completely improper. This statement, along with the lack of explanation for Cervantes' absence at trial, further indicates to this court that the State chose not to call Cervantes because her testimony would have supported the defense.

■ The State also failed to establish beyond a reasonable doubt

that defendants were predisposed to commit the offense. "Generally, predisposition is established by a defendant's willingness to participate in criminal activity before his initial exposure to government agents." *Poulos*, 196 Ill. App. 3d at 661, 554 N.E.2d at 453. Predisposition is determined by the facts of each case. *Day*, 279 Ill. App. 3d at 612, 665 N.E.2d at 871. Factors commonly considered include: "(1) defendant's initial reluctance or ready willingness to commit the crime; (2) defendant's familiarly with drugs and willingness to accommodate the needs of drug users; (3) defendant's willingness to make a profit from the illegal act; (4) defendant's prior or current use of illegal drugs; (5) defendant's participation in testing or cutting the drugs; (6) defendant's engagement in a course of conduct involving similar offenses; (7) defendant's ready access to a drug supply; and (8) defendant's subsequent activities." *Day*, 279 Ill. App. 3d at 612, 665 N.E.2d at 871.

The State relies solely on the sheer amount of cocaine sold in this case as evidence to rebut defendants' showing that they lacked a predisposition to engage in the drug transaction. We do not believe this evidence satisfies the State's burden. The State argues that one would have to be connected with the drug trade to have access to cocaine of this amount and purity. However, it does not logically follow that someone connected with the drug trade necessarily is predisposed to delivering a kilogram of cocaine, without other evidence. It could be possible to be "connected" with someone in the drug trade and at the same time lack the predisposition to commit the offense.

The evidence showed that it was Detective Aguilara who made the demand of a kilogram of cocaine. There were no other amounts discussed, and defendants simply delivered what Detective Aguilara asked for in committing this offense. If we were to affirm defendants' convictions, we in effect would be holding that any time a defendant is tried for delivery of a kilogram of cocaine, the entrapment defense is not available because here the record shows an absence of any evidence regarding the other predisposition factors. Such a holding would be both illogical and unjust.

Defendants were initially reluctant to commit the offense and backed out of the transaction on December 29. Although defendants ultimately showed a willingness to accommodate the needs of Detective Aguilara, there was evidence that their actions were motivated by a desire to please Hernandez and her mother and fear of Detective Aguilara. There is no evidence that defendants were willing to make a profit from this transaction. In fact, defendants stated that it was "Julio" who set the price. The unrebutted testimony of

defendants was that they had never been involved in a drug-related case and they were not drug users. There was no evidence that defendants had been engaged in drug-related activity prior or subsequent to this offense. Finally, there was no evidence that defendants participated in the cutting or testing of the drugs.

Accordingly, for the forgoing reasons, we believe the State failed to prove beyond a reasonable doubt that defendants were not entrapped, and defendants' convictions are hereby reversed.

Reversed.

WOLFSON and BRADEN, JJ., concur.