Sixth Division

FILED: 09/24/99

No. 1-97-0516

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the Circuit

) Court of Cook County

Plaintiff-Appellee, )

)

v.                                                             )  No. 93 CR 18387

)

ERIN CRISS, ) Honorable

) Mary Ellen Coghlan,

Defendant-Appellant. ) Judge Presiding.

JUSTICE ZWICK delivered the opinion of the court:

Defendant, Erin Criss, was charged by indictment with one count of delivery of a controlled substance.  Defendant was tried by a jury and presented the defense of entrapment.  The jury rejected this defense and found defendant guilty of the charged offense.  Defendant was sentenced to a term of nine years’ imprisonment.  On appeal, defendant seeks reversal or a new trial and raises the following eight issues as grounds therefore: (1) whether the trial court erred in instructing the jury regarding the affirmative defense of entrapment, (2) whether the court improperly excluded evidence of defendant’s lack of criminal experience, (3) whether defendant suffered prejudice by the admission of hearsay evidence of prior cocaine sales, (4) whether defendant was denied a fair trial by the admission of partially inaudible tapes without a limiting instruction, (5) whether defendant was denied a fair trial by the admission of transcripts of the tapes without a limiting instruction, (6) whether defendant was denied a fair trial and an impartial jury by the court’s refusal of proposed 
voir
 
dire
 question regarding the affirmative defense of entrapment, (7) whether defendant was deprived of a fair trial by improper closing argument by the prosecution, and (8) whether defendant was proved guilty beyond a reasonable doubt.  We address only those issues which are necessary to our disposition of the case.

The record reflects that defendant was charged with delivery of more than 100 grams, but less than 400 grams, of cocaine.  At trial, the prosecution introduced evidence that in 1992 and 1993, Chicago police officer Judith Martin was assigned to the Drug Enforcement Administration (DEA) conducting long-term narcotics investigations.  In November 1992, Michelle Farrington contacted Agent Chuck Elliott at the DEA seeking to work as an informant.  Martin and Elliott met with Farrington on December 23, 1992, at which time, Farrington was employed as a confidential informant for the DEA.  Farrington signed a work agreement pledging to forgo the use, sale, or purchase of narcotics.

On January 4, 1993, Martin and Elliott met with Farrington and made plans to make a controlled purchase of narcotics from defendant.  Elliott told Farrington the particulars of the planned transaction, including where and when it was to occur and how much money would be spent.  The planned transaction consisted of the purchase of four ounces of cocaine on January 7, 1993, at approximately 3 p.m., at 1910 North Sheffield, which was the three-flat apartment building in which both defendant and Farrington lived.

On January 7, 1993, Elliott drove an unmarked vehicle to that address and parked in the alley behind the building.  Martin was wearing a pager which contained a microphone and transmitter.  Elliott conducted surveillance of the area around the building and was equipped to monitor and record the conversation between Martin and the defendant.

Martin went to the first-floor apartment, which was occupied by Farrington and her children.  Shortly thereafter, defendant arrived, and Farrington introduced the two.  Originally, the transaction was to occur in defendant’s apartment, but she informed Martin that it could not take place in her apartment because someone was there.  Defendant indicated that the sale would have to occur in Farrington’s apartment.  Defendant suggested that she collect the money, count it, and then take it upstairs to her apartment before bringing the drugs down to Farrington’s apartment.  Martin rejected this plan, stating that she feared being “ripped off,” and suggested that defendant bring down a portion of the drugs, collect $1,000, and then bring down more of the narcotics and collect more money.  Defendant agreed to this arrangement and left Farrington’s apartment.

Approximately five minutes later, defendant returned to Farrington’s apartment and handed Martin several papers concerning an equipment leasing business in which defendant was involved.  Defendant then left the apartment again and went back upstairs.  Approximately 20 minutes later, defendant returned and handed Martin a plastic bag filled with white powder.  Martin gave defendant $1,000.  Martin then left the apartment, and returned a short time later with another bundle.  Martin gave defendant the remainder of the money.  Defendant thereafter stated the last portion was in a large chunk and asked whether Martin wanted it broken up.  Martin responded that the large chunk was fine, and defendant went upstairs.  When she returned to the apartment for the last time, defendant handed Martin a plastic bag containing a large chunk of white substance.  She also gave Martin some additional papers pertaining to her leasing business and her business card, on which she had written her pager number.  Defendant and Martin then devised a plan by which Martin could use a certain code to page defendant.

During the course of the sale, Martin and defendant talked about different things, including children, pets, and defendant’s leasing business.  Martin also told defendant that the agreed-upon purchase price was too high, and that she could not pay this price in the future.  Defendant responded that this was a “first-time only” price, and the next time it would be different.

After Martin left the apartment building, Elliott terminated his surveillance and turned off the recording device.  He then met Martin in a prearranged location, where a field test was conducted on the substance obtained from defendant.  The substance tested positive for cocaine, and Martin and Elliot returned to the DEA office where the evidence was inventoried along with two audio tape recordings of the transaction.  Martin prepared a transcript of the audio tapes.  The three plastic bags containing white powder were tested by a forensic chemist for the DEA.  The results of those tests indicated that it contained 111.8 grams of 87% cocaine hydrochloride.  Defendant was arrested on June 18, 1993.

According to Martin and Elliott, Farrington was paid for her participation in the case, however, her compensation was not dependent upon her ability to involve defendant in the narcotics transaction.  She received ten separate payments from January 7, 1993, through March 29, 1994, totaling $8,500.

Defendant testified that she met Farrington in the hallway of their apartment building during September 1992.  At that time, defendant was employed as the director of the Chicago Propfinders Handbook, which provides listings for items uses in films, conventions, and trade shows.  She also had a second job, brokering commercial printing jobs.  At that time, defendant had a cocaine habit and spent between $200 and $300 on cocaine each week and occasionally smoked marijuana.  Farrington also smoked marijuana, and the two women had smoked marijuana together.  Farrington frequently spoke of a friend for whom she had obtained drugs.  During their conversations, Farrington asked for defendant’s help in getting drugs.  Farrington first made this request in November 1992, but defendant told her that she did not sell drugs and was only a user.

According to defendant, these conversations were recurring, and Farrington began to speak more specifically about defendant’s supplier, Edwin Ayala.  Farrington asked defendant whether she could get a large quantity of drugs, but defendant declined and referred her to Ayala, whom Farrington had met.  Farrington told defendant that she had tried to page Ayala several time, but he had not responded, and she asked defendant to speak with Ayala.  Defendant testified that Farrington asked her at least ten times to set up a drug sale, and she eventually agreed because she wanted Farrington to stop bothering her about it.

When defendant went to Farrington’s apartment on January 7, 1993, a woman named Judy was already there.  Defendant testified that it was Ayala’s idea that she bring at least $1,000 at a time upstairs in exchange for the drugs.  Defendant denied that she either mixed, cut, or weighed the drugs.  She also denied that she chose the date, time, or place for the transaction or that she set the price for the sale.

According to defendant, although she participated in the sale, she did not receive compensation of any kind after it was completed.  Defendant knew that Farrington was to receive two ounces of marijuana for helping set up the sale, and Farrington showed defendant the marijuana when the transaction was over.  Defendant also testified that she and Martin discussed many things during the course of the transaction, and she gave Martin literature regarding her business as well as a business card, on which she had written her pager number.  Defendant explained that she believed Martin was a business person who might use the information as a resource and that she gives her business card to everyone.   Defendant testified that she had never sold any drugs prior to or after January 7, 1993.

Defendant testified that she did not want to be involved in the drug sale, but Ayala insisted that she participate.  She admitted that she counted the money in Farrington’s apartment, then went upstairs to her own apartment, and returned several times during the transaction.  Defendant also acknowledged that she did not inform the police that the drug sale was to take place.  After she was arrested, the police did not search her apartment.

Prior to trial, defendant filed a motion 
in
 
limine
, seeking to exclude the tape recordings of the conversations between Martin and defendant on January 7, 1993.  The trial court denied defendant’s pretrial motion as well as her request for a limiting instruction.  During trial, the jury heard the two audio tapes and received copies of the tape transcriptions.

At the instruction conference, defense counsel requested that the jury receive the version of the Illinois Pattern Jury Instruction (IPI) on entrapment which existed at the time the offense was committed, rather than the amended version existing at the time of trial.  The trial court refused this request and issued the current version of the entrapment instruction.  The jury found defendant guilty, and the court imposed a sentence of nine years’ imprisonment.  Defendant now appeals.

We initially consider defendant’s claim that she was not proven guilty beyond a reasonable doubt.  Specifically, defendant asserts that the prosecution failed to present sufficient evidence to rebut evidence of the affirmative defense of entrapment.  In addition, defendant contends that the State failed to adequately establish the chain of custody for the controlled substances tested by the forensic chemist.

In reviewing a claim by the defendant that he was convicted upon insufficient evidence, the court is obligated to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
People v. Schott
, 145 Ill. 2d 188, 203, 582 N.E.2d 690 (1991); 
People v. Young
, 128 Ill. 2d 1, 49, 538 N.E.2d 453 (1989), quoting 
Jackson v. Virginia
, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).  We find that even if the correct jury instruction had been given, a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

Here, the jury heard evidence that originally the transaction was to take place in defendant’s apartment, but she informed Martin that they could not consummate the deal there because someone was in her apartment.  Defendant then indicated that the sale would have to occur in Farrington’s apartment.  Defendant suggested that she collect the money, count it, and then take it upstairs to her apartment before bringing the drugs down to Farrington’s apartment.  When Martin objected to this plan, defendant readily agreed to bring a portion of the drugs downstairs from her apartment, collect $1,000, and then bring down more narcotics and collect more money.  The transaction occurred in this manner, with defendant leaving Farrington’s apartment three different times and returning again with narcotics each time.

In addition, defendant offered to have the last portion, which consisted of a large chunk, broken up.  Defendant also gave Martin some additional papers and her business card, on which she had written her pager number.  Defendant and Martin then devised a plan by which Martin could use a certain code to page defendant so that defendant would know that it was Martin calling.  When Martin complained that the purchase price was too high, defendant reassured her that it would be different later because the supplier would owe them.  This evidence supports the argument that defendant was in control of the situation and directed the transaction.  As such, the jury could have concluded that Farrington merely afforded defendant the opportunity to commit the offense which originated with the defendant.  Based upon the foregoing, we hold that the jury could have found defendant’s guilt beyond a reasonable doubt.

We also reject defendant’s assertion that the State failed to adequately establish the chain of custody for the controlled substances tested by the forensic chemist.  Both Martin and the forensic chemist identified the envelope containing the cocaine obtained from defendant.  Their testimony regarding the custody of the envelope and its contents was sufficient to establish the chain of custody.  In addition, we note that defendant did not challenge this evidence at trial.

We next address defendant’s claim that the trial court erred in instructing the jury regarding the affirmative defense of entrapment.  Specifically, defendant asserts that the trial court should have granted her request that the jury receive the version of the entrapment instruction which existed at the time the offense was committed.

The jury instruction on entrapment which existed in 1993 provided as follows:

“It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant, he was incited or induced by a [a public employee and/or agent of a public employee] to commit an offense.

However, the defendant was not entrapped if [a public employee and/or agent of a public employee] merely afforded to the defendant the opportunity or facility for committing an offense in furtherance of a 
criminal purpose which the defendant originated
.”  (Emphasis added.)  Illinois Pattern Jury Instructions, Criminal, No. 24-25.04 (3d ed. 1992) (hereinafter IPI, Criminal).

The language of this pattern jury instruction mirrored that of the entrapment statute which was in effect at the time of the offense.  See 720 ILCS 5/7-12 (West 1992).

However, the legislature subsequently enacted Public Act 89-332 (Pub. Act 89-

332, art. 5, eff. January 1, 1996), which amended the entrapment statute, and the IPI instruction was revised to conform with the statutory amendment.  Accordingly, when defendant was tried for delivery of a controlled substance, the IPI instruction on entrapment provided as follows:

“It is a defense to the charge made against the defendant that he was entrapped, that is that for the purpose of obtaining evidence against the defendant, he was incited or induced by [a public employee and/or agent of a public employee] to commit an offense.

However, the defendant was not entrapped 
if he was predisposed to commit the offense
 and [a public employee and/or agent of a public employee] merely afforded to the defendant the opportunity or facility for committing an offense.”  (Emphasis added.) IPI, Criminal, No. 24-25.04 (3d ed. Supp. 1996).

Defendant argues that the issuance of the newer amended jury instruction was improper because it misstated the applicable law at the time of the offense and caused her to be convicted under an 
ex
 
post
 
facto
 law.    We agree.

The 
ex
 
post
 
facto
 prohibition of the Illinois Constitution (Ill. Const. 1970, art. I, §16) has been read consistently with its Federal counterpart (U.S. Const., art. I, §9, cl. 3).  
Fletcher v. Williams
, 179 Ill. 2d 225, 229, 688 N.E.2d 635 (1997); 
Barger v. Peters
, 163 Ill. 2d 357, 360, 645 N.E.2d 175 (1994).  Under either provision, a criminal law will be invalidated if: (1) it is retrospective, i.e., it applies to events occurring prior to its enactment, and (2) it falls into one of the traditional categories of prohibited criminal laws.  
Fletcher
, 179 Ill. 2d at 230.  These traditional categories include any statute which punishes as a crime a previously committed act, innocent when done; laws which make the punishment for a crime more burdensome after its commission; and statutes which deprive one charged with a crime of any defense available at the time when the act was committed.  
Fletcher
, 179 Ill. 2d at 229, citing 
Collins v. Youngblood
, 497 U.S. 37, 41, 110 S. Ct. 2715, 2718, 111 L. Ed. 2d 30, 38 (1990).

The purpose of the 
ex
 
post
 
facto
 clause is to ensure that legislative enactments give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.  
People v. Granados
, 172 Ill. 2d 358, 367, 666 N.E.2d 1191 (1996).  Once a defendant raises entrapment as an affirmative defense and presents some evidence thereon, the burden is on the State to prove beyond a reasonable doubt that the defendant was not entrapped.  
People v. Tipton
, 78 Ill. 2d 477, 487, 401 N.E.2d 528 (1980); 
People v. Aguilar
, 218 Ill. App. 3d 1, 7, 578 N.E.2d 109 (1991).

Illinois courts have long recognized the essential nature of the defendant’s predisposition in a case where the affirmative defense of entrapment has been raised.  See   
Tipton
, 78 Ill. 2d at 487-88; 
People v. Cross
, 77 Ill. 2d 396, 405, 396 N.E.2d 812 (1979); 
People v. Chism
, 248 Ill. App. 3d 804, 811, 617 N.E.2d 1333 (1993); 
People v. Draheim
, 242 Ill. App. 3d 80, 88, 609 N.E.2d 1044 (1993); 
People v. D'Angelo
, 223 Ill. App. 3d 754, 774-75, 585 N.E.2d 1239 (1992); 
People v. Katsigiannis
, 171 Ill. App. 3d 1090, 1097, 526 N.E.2d 508 (1988).  However, prior to the amendment of the entrapment statute, the State was required to prove more than mere predisposition on the part of the defendant to defeat this defense.  Before 1996, the critical inquiry in an entrapment case was whether the "criminal purpose" 
originated
 with the defendant.  
Cross
, 77 Ill. 2d at 404; 
People v. Salazar
, 284 Ill. App. 3d 794, 800, 672 N.E.2d 803 (1996).  The amendment of the entrapment statute eliminated the need for the prosecution to prove that defendant had originated the criminal purpose.  Instead, the State need only establish that the defendant was predisposed to commit the offense.

Although there is a logical link between the two concepts, having a predisposition to commit an offense is 
not
 synonymous with having originated a criminal purpose.  We think it obvious that every person who originates a criminal purpose is predisposed to commit the offense.  Thus, proof that the defendant originated the criminal purpose simultaneously establishes that the defendant was predisposed to commit the crime.  However, the reverse is not true.  It cannot be said that a person who is predisposed to commit an offense will necessarily be the one who originated its criminal purpose.  Consequently, proof of predisposition is insufficient to satisfy the State’s burden of proving origination of the criminal purpose.

Generally, predisposition is established by proof that the defendant was ready and willing to commit the crime without persuasion and before his or her initial exposure to government agents.  
Draheim
, 242 Ill. App. 3d at 88; 
People v. Lambrecht
, 231 Ill. App. 3d 426, 434-35, 595 N.E.2d 1358 (1992); 
People v. Connor
, 176 Ill. App. 3d 900, 906, 531 N.E.2d 966 (1988).  Factors commonly considered include: (1) the defendant's initial reluctance or ready willingness to commit the crime; (2) the defendant's familiarly with drugs and willingness to accommodate the needs of drug users; (3) the defendant's willingness to make a profit from the illegal act; (4) the defendant's prior or current use of illegal drugs; (5) the defendant's participation in testing or cutting the drugs; (6) the defendant's engagement in a course of conduct involving similar offenses; (7) the defendant's ready access to a drug supply; and (8) the defendant's subsequent activities.  
Salazar
, 284 Ill. App. 3d at 802; 
People v. Day
, 279 Ill. App. 3d 606, 612, 665 N.E.2d at 867 (1996).

Significantly, the evidence which is relevant to establish predisposition goes beyond the temporal circumstances of the charged offense, and the defendant’s conduct before and after the alleged offense are relevant.  In addition, each of the above factors involves only the defendant and his actions.  However, proof of origination requires vastly different evidence, which focuses not only upon the defendant’s conduct, but also includes the actions of the government officials involved in the transaction.  Moreover, evidence necessary to prove origination centers upon the temporal circumstances of the charged offense only, and prior or subsequent conduct by the defendant is not relevant.

As the law existed in 1993, the State could not meet its burden of proof by merely establishing a predisposition by the defendant.  Rather, the State was obligated to prove that the defendant had actually originated the criminal purpose.  The amendment of the statute in 1996 and the revision of the corresponding pattern jury instruction dramatically altered the burden on the State in rebutting evidence of entrapment.  We hold that this amendment constituted a material change in the law by lessening the prosecution’s burden in overcoming evidence of entrapment.  As such, it operated to deprive defendant of a defense which was available at the time she was alleged to have committed the offense.  Because the amended version of the statute and jury instruction became effective almost three years after the alleged offense, defendant was entitled to have the jury instructed on the law as it existed in January 1993.  Accordingly, defendant’s conviction is vacated, and the cause is remanded for a new trial.

We next consider defendant’s assertion that the trial court erred in excluding evidence that she had no prior criminal record.

As noted above, the defendant’s predisposition to commit the offense has long been recognized as an important element in proving or disproving the affirmative defense of entrapment.  See 
Tipton
, 78 Ill. 2d at 487-88; 
Cross
, 77 Ill. 2d at 405; 
Chism
, 248 Ill. App. 3d at 811-12; 
Draheim
, 242 Ill. App. 3d at 88; 
D'Angelo
, 223 Ill. App. 3d at 775; 
Katsigiannis
, 171 Ill. App. 3d at 1097.  It is well established that the defendant's prior criminal record or lack thereof is among the factors which are relevant in assessing a defendant's predisposition to commit a drug-related offense.  
Tipton
, 78 Ill. 2d at 486; 
Chism
, 248 Ill. App. 3d at 812; 
People v. Miszkiewicz
, 236 Ill. App. 3d 411, 425, 602 N.E.2d 1312 (1992); 
Lambrecht
, 231 Ill. App. 3d at, 435; 
People v. Kulwin
, 229 Ill. App. 3d 36, 39, 593 N.E.2d 717 (1992); 
People v. Dobrino
, 227 Ill. App. 3d 920, 930-31, 592 N.E.2d 391 (1992); 
D'Angelo
, 223 Ill. App. 3d at 776; 
People v. Martin
, 219 Ill. App. 3d 1064, 1076, 580 N.E.2d 575 (1991); 
People v. Keen
, 206 Ill. App. 3d 940, 949, 564 N.E.2d 1314 (1990).

Notwithstanding our resolution of the first issue above, the defendant’s predisposition remains a relevant consideration, even under the 1993 entrapment statute and jury instruction.  Since both origination and a lack of predisposition were important elements of the affirmative defense of entrapment, the defendant should have been given the opportunity to present such evidence.  
Dobrino
, 227 Ill. App. 3d at 930-31; 
Katsigiannis
, 171 Ill. App. 3d at 1097.  Accordingly, we hold that the trial court erred in excluding evidence of defendant’s lack of a criminal record, and on remand, defendant should be permitted to introduce such evidence.

Finally, we consider defendant's argument that she was denied a fair trial by the admission of the tape transcripts without a limiting instruction.

It is well settled that it is proper for a trial court to permit the jury to use written transcripts of recorded conversations to assist them while they listen to the conversations, when the transcripts are used solely for this limited purpose and are collected from the jurors after they have listened to the tapes.  
People v. Rogers
, 187 Ill. App. 3d 126, 132, 543 N.E.2d 300 (1989); 
People v. Spicer
, 61 Ill. App. 3d 748, 759, 378 N.E.2d 169 (1978), rev'd on other grounds (1979), 79 Ill. 2d 173, 402 N.E.2d 169.  Even when used for this limited purpose, however, the trial court should admonish the jury as to the purpose of the transcripts and to instruct the jury to determine for itself the events transpiring on the tape.  
Rogers
, 187 Ill. App. 3d at 132; 
Spicer
, 61 Ill. App. 3d at 759.

In the case at bar, the trial court admitted into evidence the transcripts of the recorded conversations, allowing the jury to read them not only when the tapes were played in open court, but also allowed the transcripts to go back to the jury room during deliberations.  The jury was also supplied audio equipment enabling them to listen to the audiotapes during deliberations.

Defendant notes that Officer Martin testified that defendant told her that the price for the cocaine was higher than normal because it was a "first time" price.  However, the transcript shows that an "unintelligible" gap in the recording occurs at this point of the conversation.  Describing the recordings and transcripts as incomplete and unreliable, defendant contends that they are inadmissible and the trial court abused its discretion in admitting them into evidence.

Recently our supreme court addressed an almost identical fact situation in 
People v. Manning
, 182 Ill. 2d 193 (1998).  There, Dye, an inmate cooperating with the State, wore a body recording device and recorded six hours of conversation with defendant.  Dye testified at trial that defendant twice confessed to murdering the victim during those six hours.  However, the transcripts showed that inaudible gaps in the recording occurred at the time when Dye testified that defendant confessed.  Dye testified that one inaudible gap was caused by his bending over at the waist, blocking the microphone, and the other was caused by a recorder malfunction.  
People v. Manning
, 182 Ill. 2d at 212.  The trial court admitted into evidence portions of the tape-recorded conversations and during deliberations the jurors were given excerpts from the transcripts and audio equipment to listen to the tapes.  
People v. Manning
, 182 Ill. 2d at 194.

On appeal, the supreme court held as follows:

"A partially inaudible sound recording is admissible  

unless the inaudible portions are so substantial as 

to render the recording untrustworthy as a whole.  

The admission of a recording that is partially inaudible, 

or that reproduces only part of a statement or conversa-

tion, is a matter within the trial court's discretion.  
People

v. Dougherty
, 160 Ill. App. 3d 870, 876 (1987); accord

United States v. Robinson
, 956 F.2d 1388, 1395 (7th Cir.

1992); 29A Am. Jur. 2d 
Evidence
 §1238 (1994)." 
People

v. Manning
, 182 Ill. at 193.

The supreme court then found that the trial court correctly admitted the recording into evidence as the inaudible gaps in the recording were relevant only as to the weight of the evidence and not its admissibility, relying on 
United States v. Robinson
, 956 F.2d 1388, 1395 (7th Cir. 1992).  
People v. Manning
, 182 Ill. 2d at 193.

Further, while decisions of the United States District Court and the Court of Appeals are not binding upon state courts and are held to be no more than persuasive authority, they can provide guidance.  
People v. Pitzman
, 293 Ill. App. 3d 282, 291 (1997).  The Seventh Circuit repeatedly has approved the practice of sending transcripts to the jury room.  
United States v. Camargo
, 908 F.2d 179 (7th Cir. 1990), citing 
United States v. Doerr
, 886 F.2d 944, 966 (7th Cir. 1989); 
United States v. Puerta Restrepo
, 814 F.2d 1236, 1242 (7th Cir. 1987); 
United States v. Dorn
, 561 F.2d 1252, 1257 (7th Cir. 1977).   This was also the holding in 
United States v. Howard
, 80 F.3d 1194, 1200 (7th Cir. 1996) and 
United States v. Durman
, 30 F.3d 803 (7th Cir. 1994).  See also 
United States v. Brown
, 872 F.2d 385, 392 (11th Cir.) 
cert.
 
denied
, 493 U.S. 898, 110 S. Ct. 253, 107 L. Ed. 2d 203 (1989) (absent a showing that the transcripts are inaccurate or that specific prejudice occurred, no error in allowing jury to have transcripts during deliberations.)

The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and its ruling may not be reversed absent a clear abuse of discretion.  
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).  More specifically, it is within the trial court's sound discretion to determine what documentary evidence shall be sent to the jury room.  
People v. Williams
, 97 Ill. 2d 252, 291 (1983).  Applying this standard of review, the holdings in the cited federal cases, and the rationale of 
Manning
, we cannot say that the trial court erred in admitting the recordings or the transcripts into evidence.  We also note that Officer Martin testified that she was present for the conversations which were recorded and that she personally transcribed the tapes.  Therefore, a proper foundation was laid for their admission.

However, in all of the cases which have upheld sending transcripts to the jury room, the trial court instructed the jury as to the proper use of the transcripts both at the time the transcripts were first supplied to the jurors and during the final instructions.  The defense asked for such a limiting instruction to be read to the jury in this case, but the trial court refused.  To provide guidance to the jury as to the nature of the transcript, the trial court should explain that the transcript was merely the government's representation of what was said on the tape, that it was being provided to them merely as an aid to assist them in listening to the tape, that the tape rather than the transcript was the evidence, and that if a juror's understanding of the tape diverged from the transcript, their own interpretation of the tape was controlling.  See 
United States v. Howard
, 80 F.3d 1194, 1200 (7th Cir. 1996).

We find that the trial court's failure to admonish the jury as to the proper use of the transcripts was error.  This error was exacerbated by the prosecutor's reference to the tape transcripts during closing argument, implying that the jury could rely on the transcripts as evidence of what transpired between defendant, Officer Martin, and Michelle Farrington.  On remand, the trial court is instructed to admonish the jury as to the permissible use of the tape transcripts.

For the foregoing reasons, the defendant's conviction is reversed, and the cause is remanded for a new trial in accordance with the views expressed herein.

Reversed and remanded.

CAMPBELL, P.J., and QUINN, J., concur.